Frederick B. FOX et al.

v.

KANE–MILLER CORP. et al.

Civ. No. 71–600–K.

United States District Court,
D. Maryland.

May 30, 1975.

John J. Ghingher, Jr., and Alfred H. Kreckman, Jr., Baltimore, Md., for plaintiffs.

Charles H. Miller, Daniel S. Greenfeld, and Marshall, Bratter, Greene, Allison & Tucker, New York City, Alan B. Lipson and Sherbow, Shea & Boyle, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, District Judge.

Plaintiffs in this case alleged violations of the Securities Act of 1933, 15 U.S.C. §§ 77a–aa, the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–hh, the Maryland Securities Act, 3 Md.Code Ann. art. 32A, §§ 13–44 (1971 Repl.Vol.), and of common law fraud principles. Defendants denied liability and stated a counterclaim grounded in the 1934 Act and common law fraud. After a lengthy jury trial, 52 questions were submitted, pursuant to Federal Civil Rule 49(a), and answered by the jury. In their totality, those answers clearly added up to entitlement on the part of plaintiffs to judgments in their favor. Defendants have filed under Federal Civil Rule 50 for judgments in their favor in the case-in-chief and as to their counterclaim, notwithstanding the jury's answers to the special Rule 49(a) questions.

The facts of the case were to some degree stipulated and in other respects highly controverted. In February 1969 negotiations began between Frederick and Benjamin Fox (the "Foxes") and representatives of Kane Miller Corp. ("K-M") for the acquisition of three corporations owned by the Foxes (the "Fox Companies").[1] Those negotiations took place in New York and in Maryland and were conducted both in person and over the telephone. They lasted from February 1969 to May 13, 1969. As indicated *infra*, there is disagreement

---

1. Benjamin Fox died in early 1971. One of the parties in this litigation is his widow, Naomi Fox Behrens. Benjamin and Frederick Fox were apparently equal owners of the Fox Companies (Fox Canning Company, Inc., Fox Foods, Inc., and Institutional Foods Corporation) and participated equally in all transactions herein.

about some of the events during those negotiations.

At a date subsequent to February 10, 1969 and prior to May 13, 1969, K-M furnished to the Foxes in connection with the negotiations a copy of a K-M prospectus dated February 5, 1969 (the "Prospectus"), which had been drawn up in connection with a secondary offering of $1,750,000 of K-M convertible debentures, 218,750 shares of K-M common stock which were issuable upon conversion of those debentures, and an additional 286,500 shares of K-M common stock. The offerors of the debentures and common stock under the secondary offering were shareholders who had previously acquired such debentures and stock in a separate transaction with K-M unrelated to the subsequent negotiations and agreement with the Foxes. The Prospectus was drawn up and filed prior to K-M's acquisitions of Carolina By-Products Company, Inc. (Carolina), The American Meat Packing Corporation (AMPAC) and R. K. Baking Company, all of which acquisitions occurred after February 5, 1969. Carolina was acquired by K-M on March 26, 1969 for $8,000,000 in cash, a $1,000,000 promissory note and 24,922 shares of K-M common stock. AMPAC was acquired by K-M on April 16, 1969 for $8,500,000 in cash and 35,945 shares of K-M common stock. R. K. Baking Company and its three affiliated companies were acquired by K-M on May 2, 1969 for $700,000 in cash, notes payable over three years in the aggregate amount of $1,437,500, plus the greater of the value of $462,500 in cash or 10,268 shares of K-M common stock, payable in January 1972.

Each of the acquisitions made by K-M in the first half of 1969 was immediately publicly announced. News releases were sent to the Wall Street Journal, the various ticker services, and to newspapers in or near communities in which there were situated K-M subsidiaries. Prior to February 1969 K-M had acquired Bayshore Foods, Inc., a small company located only a few miles from the Fox Companies. That apparently kindled local interest and caused a number of those press releases to be printed in the *Easton Star Democrat*, the only local newspaper, a weekly. On April 2, 1969 the following article appeared in the *Easton Star Democrat:*

> KANE–MILLER CORP. has completed an agreement to purchase Carolina By-Products Co., Inc. and affiliates, Greensboro, N. C. Total purchase price will be about $10 million in cash and securities.
>
> Acquisition of Carolina By-Products further broadens Kane-Miller's agribusiness activities and adds another facet to its vertically integrated operations. Carolina By-Products converts animal and poultry materials into ingredients for poultry feed, which ties in directly with BAYSHORE FOODS, INC., the company's chicken processing subsidiary headquartered in Easton.
>
> Kane-Miller last week announced an agreement to purchase FOX FOODS, INC., Queen Anne, a vegetable processor.

On April 16, 1969, two issues later, the following article appeared in the *Star Democrat* (dealing with New York Loin which is not one of the complained of acquisitions):

> KANE–MILLER CORP. has agreed to purchase New York Loin Corporation and affiliates, New York, Kane-Miller President Daniel Kane announced last week. The contract calls for a down payment of $1.7 million in stock and additional contingency payments of up to $1 million in stock.
>
> Kane-Miller Corp., although headquartered in New York City is also a major corporate citizen of the Delmarva Pennisula. Its subsidiaries include BAYSHORE FOODS, INC. at Easton, Shorgood Poultry Co. at Milford, Del., and FOX FOODS, INC. at Queen Anne.

On or about May 5, 1969, Frederick Fox received and read several times a copy of the 1968 K-M Annual Report. That report includes, *inter alia*, the following items:

1. On page 2 of the Report—

---

## Four Acquisitions in 1969 Add $34 Million to Annual Sales Rate

Kane-Miller's expansion into areas of the nation's agribusiness economy that offer greater opportunities for higher rates of return than historically attained by the company is continuing in 1969. We have acquired:

— Carolina By-Products Co., Inc., Greensboro, N.C., and affiliates, a rendering company with a growing chemical division.

— American Meat Packing Company (AMPAC), Chicago, a large independent hog slaughterer.

And we have agreed to acquire:

— New York Loin Corporation and affiliates, New York, a meat processing company.

In addition, we have announced plans to purchase our second vegetable processor, Fox Foods, Inc., Queen Anne, Md.

Total acquisition price for the four companies, all of which had been privately held, will be more than $20 million in cash and securities at current market prices, including contingency payments based on future earnings.

Consolidated sales of Carolina By-Products exceeded $8 million in 1968, while AMPAC's sales topped $17 million. Both companies should make a significant contribution to Kane-Miller earnings if they maintain their past records of performance as expected.

New York Loin and Fox Foods markedly augment our processing capabilities. Consolidated sales of New York Loin approached $7 million in 1968, while sales of Fox Foods topped $2 million.

Each of the companies conforms with our vertical integration concepts and fits comfortably into our organizational structure. Each will operate as an autonomous subsidiary under its present management. The total combined earnings of the four companies approximated $1.5 million in 1968. The companies are described on page 7.

---

2. On page 7 of the Report—

---

## Acquisitions in 1969 Continue Expansion into New Areas

Carolina By-Products and its affiliates manufacture high-protein ingredients for animal and poultry feeds (including pet foods) and fancy tallow and other grades of animal fats used in feeds, soap production and other industrial processes. The company operates in a five-state area.

Its eight-year-old chemical division, supplied in part by other company facilities, produces organic materials used by the textile, chemical and metal industries. The division, whose products are marketed throughout the eastern United States, is becoming an increasingly important source of Carolina By-Products' earnings.

AMPAC is a "meat packer's packer." Specializing in the slaughtering of hogs, it produces pork primal cuts (such as hams, loins and ribs), lard and by-products, which are marketed to packers, processors and institutional distributors. Its slaughtering plant, one of the most efficient in the meat industry, is located in Chicago's stockyards area.

New York Loin and its subsidiaries process fabricated beef loin cuts and a variety of portion-controlled meats for distribution to the food service market. It also makes hamburger patties and other meat products for retail sale.

The company's federally-inspected facilities are centralized in a six-story plant, owned by the company, on 14th Street in Manhattan.

Fox Foods packs quality peas, corn and lima beans primarily for sale under private labels. Its products are distributed principally in the eastern United States both to chain stores and to institutional buyers.

Each of the four acquisitions bridges other Kane-Miller operations. Carolina By-Products uses waste materials from poultry in its production of feed ingredients. Thus its operations and products tie in with Bayshore Foods, and the two companies are exploring potential areas for integration.

Fox Foods, located near Bayshore's Easton, Md., headquarters, will have available Bayshore's computer installation for accounting purposes. At the same time, it complements the activities and products of G. L. Webster. New York Loin's products, like those of Fox Foods, will be marketed by the distribution subsidiaries and served in the Mayflower division's restaurants. AMPAC's products offer similar opportunities for integration. It can supply meat cuts to the distribution subsidiaries and lard to Sunnyland Refining.

3. On pages 16 and 17 the following K–M Consolidated Balance Sheet appeared—

## CONSOLIDATED BALANCE SHEET
*At December 31, 1968 and 1967*

| ASSETS | 1968 | 1967 |
|---|---|---|
| CURRENT ASSETS | | |
| Cash .............. ..................... ..... .... ......... | $ 2,316,815 | $ 1,205,410 |
| Notes and accounts receivable (net of notes receivable discounted of $5,839 and $69,873 and allowance for doubtful accounts of $260,011 and $241,976 for 1968 and 1967 respectively) .. . ....... ............... ................ .. | 6,840,876 | 5,372,707 |
| Inventories (note 2) .......... ............................ .... .. | 12,170,366 | 9,336,715 |
| Prepaid expenses ............. .................. .. ..... . ......... | 213,642 | 140,300 |
| TOTAL CURRENT ASSETS ....... ..... ...... . ... .. | 21,541,699 | 16,055,132 |
| PROPERTY, PLANT AND EQUIPMENT — AT COST | | |
| Less accumulated depreciation and amortization (notes 3 and 5) . ........... | 11,101,666 | 3,243,873 |
| EXCESS OF PURCHASE PRICE OVER BOOK VALUE PAID FOR SUBSIDIARY ACQUISITIONS (NOTE 1) ............. .............. .... . | 14,816,589 | 1,118,831 |
| OTHER ASSETS AND DEFERRED CHARGES | | |
| Notes and accounts receivable (net of allowance for doubtful accounts of $14,507 and $67,112 for 1968 and 1967 respectively) ........ .................................... | 184,221 | 157,471 |
| Deferred charges, security deposits, etc. . ............................... | 399,485 | 518,212 |
| TOTAL OTHER ASSETS AND DEFERRED CHARGES ....... .. | 583,706 | 675,683 |
| | $48,043,660 | $21,093,519 |

*The accompanying notes and accountants' opinion are integral parts of this statement.*

398 F.Supp.—39½

| LIABILITIES AND SHAREHOLDERS' EQUITY | 1968 | 1967 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Notes payable — banks (note 4) .......................................... | $ 3,300,002 | $ 4,179,998 |
| Current portion of long-term debt (note 5) ......... ......... ............ | 1,779,958 | 644,468 |
| Accounts payable ........................................ ............ | 3,624,161 | 2,665,376 |
| Federal and state income taxes (note 6) ................................ ..... | 1,654,259 | 426,717 |
| Accrued expenses and other current liabilities ............................ | 1,586,369 | 672,071 |
| TOTAL CURRENT LIABILITIES ................ ............ | 11,944,749 | 8,588,630 |
| **LONG-TERM LIABILITIES** | | |
| Long-term debt (note 5) ................................................ | 8,234,380 | 2,653,476 |
| 6% Convertible Subordinated Notes due | | |
| serially to 1982 (note 7) ................................................ | 2,050,000 | 3,750,000 |
| Payments due after one year for subsidiary | | |
| acquisitions ......................................................... | 412,533 | — |
| Other ................................................................. | 2,705 | 8,435 |
| TOTAL LONG-TERM LIABILITIES ... ...................... | 10,699,618 | 6,411,911 |
| TOTAL LIABILITIES ................ ...................... | 22,644,367 | 15,000,541 |
| COMMITMENTS AND CONTINGENCIES (NOTE 8) | | |
| **SHAREHOLDERS' EQUITY (NOTES 5, 9 AND 10)** | | |
| Common stock par value $1 | | |
| Authorized 3,000,000 shares; | | |
| issued and outstanding, 1,356,398 at December 31, 1968 | | |
| and 583,523 at December 31, 1967 .................................... | 1,356,398 | 583,523 |
| Shares to be issued in connection with | | |
| acquisition (note 9) ................................................... | 684,210 | — |
| Paid-in capital ....................................................... | 18,537,402 | 2,418,705 |
| Retained earnings ........................... ......................... | 4,821,283 | 3,090,750 |
| | 25,399,293 | 6,092,978 |
| | $48,043,660 | $21,093,519 |

*The accompanying notes and accountants' opinion are integral parts of this statement.*

4. On page 20 of the Report the following Note to the Balance Sheet appeared—

**Note 12 — Post Balance Sheet Events**

On March 26, 1969, the Company acquired all of the outstanding stock of Carolina By-Products Co., Inc. and affiliates. The purchase price consisted of $8,000,000 in cash and a promissory note of $1,000,000 bearing interest at 4% and payable in annual installments of $500,000 each commencing on January 2, 1970. In addition, the Company has agreed to deliver 24,922 shares of its common stock upon the listing thereof.

On April 4, 1969, the Company agreed to acquire all of the outstanding stock of the New York Loin Corporation and Flavor Peak Meats Corp. and their subsidiaries in exchange for a maximum of 65,350 shares of its common stock, of which approximately 40,000 shares will be delivered on closing. Issuance of the remaining shares is contingent upon future earnings of the companies acquired.

The Company has reached an agreement in principal to acquire all of the outstanding stock of Fox Canning Company, Inc., Fox Foods, Inc. and Institutional Foods Corporation in exchange for approximately 25,600 shares of its common stock, of which approximately 14,000 shares will be delivered on closing. Issuance of the remaining shares is contingent upon future earnings of the companies acquired.

In March, 1969, the Company arranged interim financing with a group of banks by borrowing $9,000,000 for a period of approximately six months with interest at ½% above the prime rate.

5. Among the other statements contained in the Report are:

(a) "Kane-Miller is a significantly stronger company today that it was a year ago." (Page 3).

(b) "Working capital totaled $9.6 million * * *." (Page 13).

In sum, the 1968 Annual Report disclosed that K-M had made four acquisitions between February 5, 1969 and May 5, 1969, none of which was mentioned in the February 5, 1969 Prospectus. Of the three acquisitons in question in this case, namely, Carolina, AMPAC and R. K. Baking, the 1968 Annual Report contaned references to the two larger, Carolina and AMPAC, and to the detailed acquisition terms of Carolina.

At trial there was conflicting testimony as to what further information, if any, the Foxes received during the February-June 1969 period as to acquisitions by K-M of companies other than the Fox Companies. Daniel and Stanley Kane, the principal executive officers of K-M, and Bruce Slovin, who was Executive Vice-President of K-M during K-M's 1969 negotiations with the Foxes, all testified that they orally provided the Foxes (particularly Frederick) with complete information as to the details of each acquisition as soon as it took place. They testified that Frederick Fox was particularly eager to find out the financial details of the various acquisitions and was favorably impressed by the effect each had on the overall position of K-M. Frederick Fox, however, testified that he could not recall that he received any information about acquisitions other than that contained in the Report and that in any event any such information did not make much of an impression on him.

In particular the Foxes claim that they were not provided with complete information concerning the purchase price of AMPAC and R. K. Baking and they were not informed that those purchases when combined with that of Carolina meant that K-M would have to borrow approximately $15,000,000 in short term funds. Although that debt was refinanced by K-M in December 1969 by an offering of $22,500,000 of long term, 9½% convertible debentures, it is the Foxes' position that for some period of time in 1969 the liquidity of K-M's financial position was impaired and that most or all of the decline in value of K-M stock since 1969 has been due to K-M's impaired credit position during that period of time.

On or about April 7, 1969, K-M prepared the following pro forma balance sheet which projected the effects of the acquisitions of Carolina and AMPAC on the K-M Consolidated Balance Sheet. That pro forma balance sheet was circulated in early March 1969 to certain per-

sons including the banks which loaned K-M the money it used to acquire AMPAC and Carolina, but it was apparently not given to the Foxes:

### KANE-MILLER CORP.
### PRO-FORMA CONSOLIDATED BALANCE SHEET
### DECEMBER 31, 1968

#### ASSETS

| | KANE-MILLER 12/31/68 | CAROLINA 12/31/68 | *AMPAC 3/15/69 | ADJUSTMENTS** | TENTATIVE PRO-FORMA CONSOLIDATED BALANCE SHEET | SUBSEQUENT ADJUSTMENT** | PRO-FORMA CONSOLIDATED BALANCE SHEET |
|---|---|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | | | |
| Cash | 2,316,815 | 2,601,684 | 1,249,305 | 1,000,000(f) 8,000,000(a) / 6,500,000(e) 217,214(b) / 8,500,000(d) | 4,950,590 | 2,000,000(f) | 6,950,590 |
| Notes & Accounts Receivable-Net | 6,840,876 | 528,332 | 876,506 | | 8,245,714 | | 8,245,714 |
| Inventories | 12,170,366 | 91,219 | 283,015 | | 12,544,600 | | 12,544,600 |
| Prepaid Expenses & Other | 213,642 | 77,651 | 28,367 | | 319,660 | | 319,660 |
| TOTAL CURRENT ASSETS | 21,541,699 | 3,298,886 | 2,437,193 | | 26,060,564 | | 28,060,564 |
| Property, Plant & Equipment – Net | 11,101,666 | 2,276,397 | 481,207 | | 13,859,270 | | 13,859,270 |
| Excess of Purchase Price Over Book Value Paid for Subsidiary Acquisitions | 14,816,589 | — | — | 5,042,474(a) 7,297,962(d) | 27,157,025 | | 27,157,025 |
| Other Assets | 583,706 | 547,557 | 23,265 | | 1,154,528 | | 1,154,528 |
| TOTAL ASSETS | 48,043,660 | 6,122,840 | 2,941,665 | | 68,231,387 | | 70,231,387 |

#### LIABILITIES AND STOCKHOLDERS' EQUITY

| | KANE-MILLER 12/31/68 | CAROLINA 12/31/68 | *AMPAC 3/15/69 | ADJUSTMENTS** | TENTATIVE PRO-FORMA CONSOLIDATED BALANCE SHEET | SUBSEQUENT ADJUSTMENT** | PRO-FORMA CONSOLIDATED BALANCE SHEET |
|---|---|---|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | | | | |
| Notes Payable-Banks | 3,300,002 | 217,214 | — | 217,214(b) 9,000,000(b) / 2,500,000(c) 6,500,000(e) | 16,300,002 | 15,500,000(f) | 800,002 |
| Current Portion of Long-Term Debt | 1,779,958 | — | — | | 1,779,958 | | 1,779,958 |
| Accounts Payable | 3,624,161 | 354,371 | 32,971 | | 4,011,503 | | 4,011,503 |
| Liability for Income Taxes | 1,654,259 | 452,389 | 105,051 | | 2,211,699 | | 2,211,699 |
| Accrued Expenses & Other Current Liabilities | 1,586,369 | 141,340 | 101,605 | | 1,829,314 | | 1,829,314 |
| TOTAL CURRENT LIABILITIES | 11,944,749 | 1,165,314 | 239,627 | | 26,132,476 | | 10,632,476 |
| **LONG TERM LIABILITIES** | | | | | | | |
| Long Term Debt | 8,234,380 | — | — | 2,500,000(c) | 10,734,380 | | 10,734,380 |
| 6% Convertible Sub.Debt. | 2,050,000 | — | — | | 2,050,000 | | 2,050,000 |
| Due for Subs.Acquis. after one year | | | | 1,000,000(a) 1,000,000(a) / 1,500,000(d) | 1,412,533 | | 1,412,533 |
| Other | 412,533 2,705 | — | — | | 2,705 | | 2,705 |
| TOTAL LONG-TERM LIABILITIES | 10,699,618 | — | — | | 14,199,618 | | 14,199,618 |
| TOTAL LIABILITIES | 22,644,367 | 1,165,314 | 239,627 | | 40,332,094 | | 24,832,094 |
| STOCKHOLDERS' EQUITY | 25,399,293 | 4,957,526 | 2,702,038 | 4,957,526(a) 1,000,000(a) / 2,702,038(d) 1,500,000(d) | 27,899,293 | 17,500,000(f) | 45,399,293 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | 48,043,660 | 6,122,840 | 2,941,665 | | 68,231,387 | | 70,231,387 |

\* As adjusted for assets to be purchased prior to proposed acquisition
\*\* See separate sheet for explanation of adjustments

*Gerald Miller & Company*
CERTIFIED PUBLIC ACCOUNTANTS

KANE–MILLER CORP.

EXPLANATION OF ADJUSTMENTS

TO PRO–FORMA CONSOLIDATED BALANCE SHEET
DECEMBER 31, 1968

(a) Acquisition of Carolina By–Products Corp. and subsidiaries for
$8,000,000 in cash plus $1,000,000 in stock (consummated March 1969).

(b) Bank financing obtained March 1969 for Carolina By–Products
acquisition ($9,000,000 due in approximately six months) and
repayment of Carolina By–Products bank loan.

(c) Reclassification of $2,500,000 bank loans being held for take–out
by Massachusetts Life Insurance Co. pursuant to Agreement.

(d) Proposed acquisition of The American Meat Packing Corporation
(Ampac) for $8,500,000 in cash and $1,500,000 in stock.

(e) Proposed additional short–term bank financing of $6,500,000 for
Ampac acquisition.

SUBSEQUENT ADJUSTMENT

(f) To reflect proposed public offering to net the Company $17,500,000
before the year–end (tentatively scheduled for September 1969).

In May 1969 the Foxes and K-M entered into an agreement (the "Agreement") dated May 13, 1969 providing for the sale by the Foxes of all of the outstanding stock in the Fox Companies in return for 25,582 shares of K-M common stock, of which 13,954 were to be delivered outright to the Foxes and the remaining 11,628 were to be placed in escrow. The number, if any, of those escrow shares to be transferred outright to the Foxes was contingent upon the future earnings of the Companies. At the same time, Benjamin and Frederick Fox entered into employment contracts with K-M, each of said contracts to run through April 1, 1973, at a salary for each of the Foxes of $25,000 per year. The Agreement was executed on May 13, 1969 and the sale was closed on June 3, 1969 in Easton, Maryland. The K-M stock that the Foxes received on that date bore a legend that it could not be disposed of without a registration statement or an opinion of counsel of K-M that it could be sold without a registration statement.

During the latter part of 1970 a dispute arose between K-M and the Foxes as to whether the inventory of the Fox Companies had been misstated at the time of their acquisition by K-M. On December 31, 1970 a settlement agreement (the "Settlement Agreement") was entered into between the parties. It provided that the Foxes would return half or 6977 of the 13,954 shares of K-M stock they had received outright in June 1969 and that they would give up any rights they might have had in the escrow shares. Furthermore, the employment contracts of Frederick and Benjamin Fox were altered by moving their termination days forward fifteen

months from April 1, 1973 to December 31, 1971. The Settlement Agreement specifically provided that it did not constitute an admission of any liability by the Foxes to K-M. Just over five months later, on June 2, 1971, the Foxes brought this action.

Plaintiffs' complaint is stated in nine counts.[2] The defendants,[3] in addition to filing general denials to the complaint, advanced six affirmative defenses and a counterclaim against the Foxes.

Count I alleges that K-M violated section 12(2) of the Securities Act of 1933 (" '33 Act"). Counts II and III allege violation of section 17(a) of the '33 Act. Counts IV and V allege violations of Rule 10b–5 promulgated under section 10(b) of the Securities Exchange Act of 1934 (" '34 Act"). Count VI alleges a common law breach of warranty by K-M of the May 1969 Agreement. Count VII alleges violations of section 34 of the Maryland Securities Act, 3 Md.Ann. Code art. 32A, § 34 (1973 Cum.Supp.). Count VIII alleges that K-M committed common law fraud when it entered into the May 1969 Agreement. Count IX alleges that K–M violated Rule 10b–5 and committed common law fraud in connection with the December 1970 Settlement Agreement.

Defendants' asserted affirmative defenses are failure to state a claim, release, waiver, estoppel, laches and limitations. Defendants' counterclaim alleges that the Foxes violated Rule 10b–5 and committed common law fraud in connection with the Settlement Agreement.

Counts II and III were voluntarily dropped by the Foxes prior to trial. As discussed *infra*, this Court granted summary judgment for K-M as to Count VI prior to trial. Since the language of section 34 of the Maryland Securities Act is substantially identical to that of section 12(2) of the '33 Act (except for its provision of attorneys' fees as part of the recovery), the parties agreed prior to trial that a jury finding of liability or non-liability with respect to Count I would be binding as to Count VII except that the defendants could still raise the affirmative defense to Count VII provided by section 34(f) of the Maryland Securities Act.[4] Because that affirmative defense and Count IX were filed shortly before trial and together raised the possibility that the parties would need or desire to present evidence as to the facts underlying the inventory dispute which was resolved by the December 1970 Settlement Agreement[5] and because neither side

2. The complaint as originally filed named only K-M as defendant and was contained in six counts. The individual defendants were added pursuant to Federal Civil Rule 15(a). Additionally, this Court permitted plaintiffs to add three counts to their complaint and defendants to add a counterclaim and one or more additional defenses, more than two years after defendants had filed their answers, on a relation-back basis pursuant to Federal Civil Rule 15(c).

3. Throughout this case the defenses of K-M and the individual defendants have been coordinated completely. Throughout this opinion "K-M" is used to refer to all of the defendants.

4. That section provides:
(f) *Effect of making or performing contract with knowledge of facts.*—No person who has made or engaged in the performance of any contract in violation of any provision of this subtitle or any rule or

order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

5. If that had proven necessary, the parties indicated, and this Court reluctantly agreed, that further discovery and further trial delay may have proven necessary. The counterclaim itself did not *per se* raise any such problem because the counterclaim in no way seeks to reopen the inventory dispute but rather charges that the Foxes fraudulently obtained the Settlement Agreement by withholding from K-M the alleged intention in December 1970 of the Foxes to file the instant suit. During the trial counsel, by agreement among the parties and with this Court, in fact succeeded in substantially eliminating detailed testimony as to the inventory dispute.

sought to rescind that Agreement, the parties and this Court agreed that the issues pertaining to Count IX and the section 34(f) affirmative defense would be separated pursuant to Federal Civil Rule 42(b) from the other triable issues and those two separated issues would be later tried before the same jury empanelled for the first portion of the trial. The parties and this Court also agreed, pursuant to Federal Civil Rule 42(b), to reserve for subsequent non-jury trial the issue of the amount of counsel fees under Count VII. Thus, the case went to trial before the jury upon (1) Count I—section 12(2); (2) Counts IV and V—Rule 10(b)–5; (3) Count VIII—common law fraud; and (4) the counterclaim.

### THE WARRANTY CLAIM—
### COUNT VI

Before trial the parties each filed motions for summary and/or partial summary judgment pursuant to Federal Civil Rule 56. All of those motions were denied because of the existence of factual disputes except defendants' motion relating to Count VI. In that count, the Foxes allege that K–M warranted in the May 13, 1969 Agreement that the February 5, 1969 Prospectus contained all information required to be disclosed therein and that the warranties of K–M were to be true and of the same effect as if they had originally been made at the time of the closing. Sections 3.1 and 6.4 of the May 13th Agreement provide:

3.1 The representations and warranties of Kane-Miller contained herein shall be true and not breached at and as of the time of Closing, with the same effect as though such representations and warranties had been repeated at and as of such time.

6.4 There have been delivered to the Stockholders copies of Kane-Miller's Prospectus dated February 5, 1969. Such Prospectus contains all information required to be disclosed therein by the Securities Act of 1933, as amended, or the rules and regulations of the Securities and Exchange Commission thereunder. Such Prospectus does not include any untrue statement of a material fact and does not omit to state any material fact so required to be stated therein necessary to make the statement therein not misleading.

Section 6.4 sets forth a warranty made by K–M on May 13, 1969 that the Prospectus was accurate as of the date it was dated, namely, February 5, 1969. Section 6.4 contains no warranty by K–M that the Prospectus was still accurate on May 13th. Section 3.1 provides that as of June 3, 1969, all warranties in the May 13th Agreement, including that set forth in section 6.4, would remain true. Together they simply provide that on February 5, 1969 the Prospectus contained all required information, etc., and that on May 13, 1969 and June 3, 1969 K–M still believed that on February 5, 1969 the Prospectus contained that information. K–M did not warrant in section 3.1 or section 6.4 or elsewhere in the May 13, 1969 Agreement that the Prospectus gave an accurate picture of K–M as of either May 13th or June 3rd of that year. The May 13th Agreement did not contain any warranty that there had been no adverse changes in K–M's condition since February 5, 1969 and no such warranty is reasonably inferable from the language of the Agreement including sections 3.1 and 6.4 thereof.

Plaintiffs have conceded that the February 5th Prospectus was accurate as of that date. Accordingly, since the May 13th Agreement, and sections 6.4 and 3.1 thereof, warrant nothing more, defendants' motion for summary judgment as to Count VI, that is, the breach of warranty count, was granted by this Court prior to trial. In passing, it is additionally noted that in the December 31, 1970 Settlement Agreement plaintiffs, in paragraph 4 of that document, agreed to terminate all obligations K–M might have owed them under section 6.4 of the original Agreement and that section 3.1 standing alone without section 6.4 con-

tains no mention of the February 5, 1969 Prospectus.

## EFFECT OF THE SETTLEMENT AGREEMENT

██ Throughout the entire course of this litigation K–M has continuously asserted that the complaint should be dismissed as stating claims which are within the coverage and the meaning of the December 1970 Settlement Agreement and that that latter document constitutes a final and complete settlement of all claims between K–M and the Foxes growing out of the 1969 transaction. While that might have been a reasonable goal for K–M to pursue at the time the Settlement Agreement was entered into in 1970, and while it is possible, as K–M has asserted, that that is what K–M thought it was obtaining in the Settlement Agreement, the only language in that agreement which releases K–M from any obligations to the Foxes is paragraph 4 which provides as follows:

4. The representations and warranties made by Kane-Miller in Section 6.4 of the Agreement are hereby terminated and of no further force or effect, and Kane-Miller shall have no further obligation to the Stockholders in respect thereof.

That language is precise and narrow and speaks for itself. K–M was represented by competent counsel during the period K–M negotiated and then entered into the Settlement Agreement. A party well represented by counsel who signs a carefully worded document offering him a narrow and specific release will not be heard, in the absence of any effort on his part to rescind the document, to say that it was his belief that it was in fact a general release. *See generally* as to the parole evidence rule and its applicability, 3 A. Corbin, Contracts § 573 *et seq.* (1960); Restatement of Contracts § 237 (1932); Restatement (Second) of Contracts §§ 239–44 (Tent. Draft No. 6, March 31, 1971); 9 J. Wigmore, Evidence § 2425 *et seq.* (3d ed. 1940). If the Settlement Agreement constitutes such a general release, evidence thereof must be found in the text of the document itself—and in this case it is not there to be found.

██ Furthermore, K–M's explicit and implicit advancement of the affirmative defenses of release, waiver and estoppel must confront the very strong disfavor in which such defenses are held in securities cases. Both the '33 Act (in § 14, 15 U.S.C. § 77n) and the '34 Act (in § 29(a), 15 U.S.C. § 78cc(a)) contain very specific anti-waiver clauses[6] as does the Maryland Securities Act (3 Md.Ann. Code art. 32A, § 34(g)).[7] In *Wilko v. Swan,* 346 U.S. 427, 438, 74 S.Ct. 182, 188, 98 L.Ed. 168 (1953), Mr. Justice Reed wrote, in a 12(2) case, that "[Congress] has enacted the Securities Act to protect the rights of investors and has forbidden a waiver of any of those rights." While it may be true, as counsel for K-M has argued, that those provisions should not be read as applying literally to releases made after the alleged violation of the law and made as part of the settlement of a valid dispute, nevertheless those provisions dictate a cautious approach to such defenses when they are raised in securities cases.

██ K-M also claims that even if paragraph 4 of the 1970 Settlement

---

6. Section 14 reads:
Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.
Section 29(a) reads:
Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

7. Section 34(g) reads:
*Provision for waiver of compliance with section void.*—Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subtitle or any rule or order hereunder is void.

Agreement. does not bar the Foxes' claims herein, those claims are barred by paragraph 1 of the Settlement Agreement which provides in part:

> * * * It is agreed that the entire consideration which the Stockholders [the Foxes] shall be entitled to retain in exchange for all of the outstanding shares of stock of the Companies shall be 6,977 shares of Kane-Miller common stock * * *.

Those words, K-M asserts, prevent the Foxes from pursuing the within action since any recovery in this case by the Foxes would constitute additional "consideration" to them. But paragraph 1 is not phrased in the language of general release. It is directed toward the number of shares of K-M stock the Foxes were to retain after the subtractions negotiated to settle and dispose of the claims made by K-M prior to December 31, 1970 that the Foxes had in the May 13, 1969 Agreement fraudulently misstated the Companies' inventory. Words of general release are commonly used by attorneys. They were not used in paragraph 1 any more than they were used in paragraph 4 of the Settlement Agreement. In sum, the "release" approach of defendants may not prevail.[8]

### COUNT I—SECTION 12(2) OF THE '33 ACT

In Count I of the complaint, the Foxes seek damages under section 12(2) of the '33 Act. At no time has either side sought to rescind the Agreement and return the Fox Companies to the hands of the Foxes and the K-M stock the Foxes hold to K-M.[9] Section 12(2) (15 U.S.C.

§ 77l(2)) provides, in pertinent part, that

> * * * the person purchasing such security * * * may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

The Foxes contend that they no longer possess all of the "security" since they returned 6977 shares pursuant to the Settlement Agreement and that in any event the clear import of section 12(2) is that damages should be available if rescission, in a practical sense, is impossible, as the Foxes argue it is in this case because K-M has so changed the Fox Companies as to make them into something far different than they were in June 1969. K-M, while agreeing that rescission is not practically possible, argues that section 12(2) provides no remedy at all for the Foxes because the Foxes still hold the K-M stock. That view expressed by K-M may or may not be correct. *See Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *Johns Hopkins University v. Hutton*, 297 F.Supp. 1165, 1226 (D.Md.1968), *aff'd in part, rev'd in part on other grounds*, 422 F.2d 1124 (4th Cir. 1970) (seemingly *aff'd*, at 1131–32, as to the point of this citation), *on remand*, 326 F.Supp. 250, 262 (D.Md.1971), *aff'd in part, rev'd in part on other grounds*, 488 F.2d 912 (4th Cir. 1973); *Pfeffer v. Cressaty*, 223 F.Supp. 756, 757 (S.D.N.Y.1963). However, in a

---

8. The claims of both sides, the Foxes in Count IX and K-M in its counterclaim, that the other side violated both statute and common law, by misrepresentations, or failure appropriately and affirmatively to disclose, in connection with obtaining the Settlement Agreement, are not affected by whether or not any of the provisions of that Agreement constitute a release. Those other claims are discussed *infra*.

9. However, the Foxes, who have tendered the return of all of the K-M shares the Foxes still own, do seek "rescissional" damages. The question of whether the Foxes are entitled to such type of damages in a context other than 12(2) is discussed *infra* at p. 629 *et seq.* At this point in this opinion the issue of "rescissional" damages is faced only with relation to the 12(2) cause of action stated by the Foxes.

factual situation in which rescission is either impossible or not practically possible, such a result may perhaps be so harsh as to be untenable within the policy framework of a provision such as section 12(2) in a statute such as the '33 Act.[10] But even if the Foxes may seek relief under 12(2), in the form of "rescissional" or other damages, they are barred from so doing in this case by section 13 of the '33 Act which provides in pertinent part (15 U.S.C. § 77m):

> No action shall be maintained to enforce any liability created under section . . . [12(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . .

In *Johns Hopkins University v. Hutton*, 422 F.2d *supra* at 1131, Judge Butzner commented:

> * * * But the one-year limitation of Section 13 does not depend wholly on the subjective judgment of the buyer. Instead it must be tested by the objective standard of reasonable diligence on the part of the buyer in making discovery. * * * Had Hopkins compared all the experts' reports, which it had a right to do under the terms of the production payment, it could readily have discovered the untrue statements and the omissions about which it now complains.

In this case the misrepresentations and omissions that the Foxes are complaining about are related to the acquisitions made between February 1969 and May 13, 1969 and the effect that those acquisitions had upon the K–M balance sheet and consequently upon the value of K–M stock. For purposes of liability under section 12(2) the key question is what knowledge did the Foxes have, or what knowledge should the Foxes have had, about those facts on or before June 2, 1970, one year before this action was instituted on June 2, 1971.

■ The 1968 Annual Report of K–M which Frederick Fox read several times on or before May 5, 1969 refers to the acquisitions of Carolina and AMPAC and also contains the details as to the acquisition price of Carolina. On June 20 and 21, 1969 a K–M corporate management meeting was held in Maryland. Both Frederick and Benjamin Fox attended that meeting as did four officers of AMPAC, four officers of Carolina and two officers of R.K. Baking. Each person attending that meeting was publicly introduced by name by Bruce Slovin to all of those present and a picture of all of those present was distributed to all those present. At that time a copy of the 1969 K–M First Quarter Report was distributed to all of those present. On the third page of that Report, under the heading "Five firms become subsidiaries", AMPAC, Carolina, R.K. Baking, New York Loin and the Fox Companies are listed. Accordingly, the Foxes either had knowledge or should have had knowledge by the exercise of reasonable diligence of all the acquisitions by June 21, 1969.

---

10. If the remedy of restitution is available in a 12(2) case to plaintiffs who find themselves unable as a practical matter to obtain rescission, that remedy would seemingly provide the result of awarding "rescissional" type damages. *See* 5 A. Corbin, Contracts § 1107 at 574 (1964):

> If the defendant has received possession or ownership of some specific land or goods transferred by the plaintiff, the remedy of restitution may at times involve the specific restoration of the plaintiff to his former possession or ownership. In such cases, the defendant has received

something from the plaintiff and he is compelled to give it back. In most cases, however, the remedy of restitution means the restitution of money value, and not the return of some specific thing received by the defendant. If the defendant has received such a specific thing from the plaintiff, it may have been consumed, lost, or destroyed by the defendant, so that specific restoration is impossible.

It should be noted that section 12(2) uses neither the term "rescission" nor "restitution"; rather it refers to plaintiff's right "to recover the consideration paid . . . ."

In a letter dated May 9, 1970, and sent to Daniel Kane, Frederick Fox made the following statement:

I certainly am proud of that annual report which just came out. It was extremely well done . . . .

That report, the 1969 K–M Annual Report, contains on pages 16–22 a detailed and concededly accurate K–M balance sheet as of December 31, 1969. In his testimony at trial, Frederick Fox emphasized the care and attention with which he read the February 5, 1969 Prospectus balance sheet during the negotiations leading up to the acquisition of the Companies. Although he denied on the stand that he read any later balance sheet with anything like the attention he gave to the one in that Prospectus, he should have had, with the exercise of reasonable diligence, considerable knowledge of K–M's financial position as of December 31, 1969. The balance sheet as of that date indicates in several places the complained about acquisitions and in Note 6 on Page 19 gives details of the $22,500,000 offering of 9½% convertible debentures which K–M made in December 1969 in part to pay off the short term notes used by it to acquire AMPAC and Carolina.

Between June 9, 1969 and May 1, 1970, K–M sent the Foxes no fewer than ten copies of drafts of prospectuses and registration statements.[11] Although Frederick Fox has testified that he only read the portion of each one that dealt specifically with the Fox Companies and did not read any other portions of it, each of those documents contained true and accurate pictures of the financial condition of K–M as of the date they were printed. There was undisputed evidence that the Foxes received a copy of the K–M Preliminary Prospectus dated June 30, 1969 sometime during July 1969. On pages 627–628 of that document, the same page at which details are stated about the acquisition of the Fox Companies, details of the acquisitions of Carolina, AMPAC and R. K. Baking are given with accurate dollar figures for the amounts of cash, notes and stock paid for each.[12] That prospectus also in-

---

11. Several of those 1969–70 draft prospectuses and registration statements dealt with a proposed public offering of K–M common stock which was planned for the summer or fall of 1969 and which was intended to be used in part to pay off the short term borrowings K–M had made in connection with its acquisitions of Carolina and AMPAC. That offering was never in fact made. The Foxes had indicated during May 1969 that they desired that a portion of the K–M shares which they would acquire outright from K–M pursuant to the May 1969 Agreement be included among the shares covered by that proposed registration statement so that the Foxes could sell those shares. Additionally, certain other of those 1969–70 draft prospectuses and registration statements dealt with the public offering of $22,500,000 in debentures which K–M in fact did make in December 1969 in order to pay off its short term borrowings. The remaining 1969–70 draft prospectus and registration statement dealt with various K–M financing plans after December 1969 which seemingly had no direct connection with the matters considered herein. Like all of the other 1969–70 draft prospectuses and registration statements sent to the Foxes, however, they did accurately portray K–M's financial position.

12. The following is a copy of the pertinent part of that page:

On March 26, 1969, the Company acquired Carolina By-Products Company, Incorporated ("Carolina By-Products"), an animal waste renderer and chemical manufacturer, from Mr. Stanley Frank and members of his family for $9,000,000 (of which $8,000,000 has been paid and $1,000,000 is evidenced by the Company's 4% note payable in equal installments in January, 1970 and January, 1971) and 24,922 shares of Common Stock. Mr. Frank continues as chief operating officer of Carolina By-Products. The Company entered into five-year employment agreements with three other officers of Carolina By-Products.

On April 16, 1969, the Company acquired The American Meat Packing Corporation ("Ampac"), a hog slaughterer, from Mr. Edward R. Ochylski, Jr. for $8,500,000 and 35,945 shares of Common Stock. In addition, the Company will pay to Mr. Ochylski the difference, if any, between $500,000 and the net proceeds received by him from the sale of the first one-third (11,982) of such shares. The Company paid a $200,000 business brokerage fee in connection with the Ampac acquisition, entered into a two-year employment agreement with Mr. Ochylski

cludes a March 1969 pro forma balance sheet which reflected the acquisition of Carolina and AMPAC.

The Foxes claim that they were unaware until January 1971 of the details of the acquisitions of those three companies and the effect those acquisitions had upon the overall financial picture of K–M. But at least five months before the end of the year 1969, the Foxes had in their possession documents which set forth the details of those acquisitions. The major, if not sole effect, of those acquisitions of which the Foxes complain is the substantial decline in the market value of K–M stock which they assert (and K–M denies) was caused by the market's recognition of the allegedly adversely altered financial picture of K–M after the latter made the three acquisitions. By June 1970, K–M stock had fallen from the high of over 50 which it reached near the beginning of 1969 to under 15. It is hard for this Court to believe, despite the jury's answers to the special questions put to it,

that the Foxes were unaware of the precipitous decline in the value of the stock which was the entire return received by them for the sale of their family business—a business which constituted their major asset—and that at the same time the Foxes failed to read with some degree of care the information set forth in documents handed or otherwise available to them relating to K–M's then current financial condition. But in any event, even if the Foxes did not themselves actually know of the same on or before June 2, 1970, the Foxes, in the exercise of reasonable diligence, should have discovered, on or before that date, what the jury in this case has found to constitute material untrue statements and omissions relative to the 1969 transaction. It therefore follows that even if the Foxes may seek damages in a 12(2) action, notwithstanding their continued ownership of K–M shares, they are barred from successfully so doing by the one-year limitations provision of section 13.

under which he has agreed not to compete with the present business conducted by Ampac for three years after the conclusion of his term of employment, leased from Mr. Ochylski and family trusts the Ampac plant, and obtained an exclusive license from Mr. Ochylski for the continued use by Ampac of his unique patented "de-hiding" machine.

On May 2, 1969, the Company acquired R. K. Baking Corp. ("R.K. Baking"), a baker of pastries, cakes and pies, and three affiliated companies, from Mr. Seymour Rappaport and members of his and Mr. Charles Gottfried's families, for an aggregate purchase price of $2,137,500, of which $700,000 has been paid, $512,500 is payable with interest in January, 1970, and $462,500 is payable with interest in each of January 1971 and 1972. As additional consideration, the Company will pay to the sellers in January, 1972 the greater of $462,500, plus interest, or, if the then market value thereof is greater than such amount, 10,268 shares of the Company's Common Stock, or its cash equivalent. Another affiliated company was greater than such amount, 10,268 shares of of Common Stock, with 1,500 additional shares being reserved for issuance should the market price of the Common Stock fall below a specified level. The Company paid a business brokerage fee of $95,000 in connection with these acquisitions, entered into

five-year employment agreements with Messrs. Gottfried and Rappaport, and leased R.K. Baking's plant from another corporation owned by the sellers.

On May 5, 1969, the Company acquired The New York Loin Corporation ("New York Loin"), a fabricator of beef hind-quarter wholesale cuts and a manufacturer of certain specialty meat items, from Messrs. Jack Caan, Lothar Weichsel and Gerald Sussman and members of their families for a maximum of 65,663 shares of the Company's Common Stock, of which 40,963 shares have been issued and 24,700 shares are reserved for issuance depending on future earnings of New York Loin. The Company issued 600 shares of Common Stock to a business broker in connection with the acquisition and entered into five-year employment agreements with Messrs. Caan, Weichsel and Sussman.

On June 3, 1969, the Company acquired Fox Canning Company, Inc. ("Fox"), a wholesale canner of corn, peas and lima beans, from Messrs. Frederick B. Fox and Benjamin Fox for 25,582 shares of Common Stock, of which 11,628 shares are held in escrow subject to delivery or cancellation in whole or in part, depending on future earnings of Fox. The Company entered into four-year employment agreements with the Messrs. Fox.

In their answers to Questions VIII through XI of the Special Jury Questions, the members of the jury found that the Foxes neither knew nor, by the exercise of reasonable diligence or care, should have known of the untruths or omissions complained of herein before June 3, 1970. To the extent that those answers are inconsistent with this Court's conclusions as stated *supra,* this Court holds that those answers by the jury are totally without support in the record. While Frederick Fox did testify that he did not know of the untruths or omissions, and there thus was evidence from which the jury could find actual lack of knowledge by plaintiffs, the record establishes that the Foxes with the exercise of reasonable diligence and due care should have known of the same. In that last regard, not only did plaintiffs fail to establish by a preponderance of the evidence that they should not have so known, but defendants established the contrary by clear and convincing evidence if not beyond a reasonable doubt. In point of fact, there was not sufficient evidence to go to the jury on that issue, in the face of a motion for a directed verdict by defendants. However, nevertheless, this Court allowed that question to go to the jury and submitted the question to the jury "subject to a later determination" in a judgment-notwith-standing-the-verdict context as provided in Federal Civil Rule 50(b) in line with Judge Craven's strong suggestion in *Phoenix Savings & Loan v. Aetna Casualty & Sur. Co.,* 427 F.2d 862 (4th Cir. 1970). Therein, Judge Craven wrote (at 873–74):

> \* \* \* Indeed, we note in passing that it is frequently the better practice, where all of the evidence has been presented to the jury and at the close of the evidence a motion for directed verdict is made, for the trial judge to reserve ruling on that motion until the jury has reached a verdict. Should it then be deemed necessary to grant the motion, the jury verdict can be reinstated without the necessity of

costly retrial if, on appeal, the directed verdict or judgment notwithstanding the verdict be found in error.

\* \* \*

*COUNT VII—SECTION 34 OF THE MARYLAND SECURITIES ACT —AND COUNT IX*

■ As discussed *supra,* the parties and this Court have agreed, prior to trial, that the language of sections 34(a)(2) and (g) of the Maryland Securities Act and sections 12(2) and 13 of the '33 Act are substantially identical and that a finding of liability *vel non* as to one of them would be a finding as to the other (subject to the affirmative defense found in section 34(f) of the Maryland Act). Therefore, since this Court has held *supra* that section 13 offers a complete defense to Count I, which alleges a violation of section 12(2), this Court also holds that section 34(g) offers a complete defense to that count based on the Maryland Act, namely, Count VII. Consequently, there is no need for this Court to confront the issue of the meaning or possible application of section 34(f) of the Maryland Act. Nor is there any need for this Court to hold at this time a non-jury trial in order to determine the amount of counsel fees the Foxes would be entitled to receive under Count VII if they had been successful in establishing liability under that count. Of course, if this Court is in error as to Count VII, a jury trial as to the 34(g) question and a non-jury trial as to the counsel fee issue would seemingly be required upon remand.

After the jury verdict, counsel for the Foxes informed this Court that the Foxes had decided not to press Count IX which raised the only issue, other than that presented by the section 34(g) defense to Count VII, which had been reserved for the second or bifurcated portion of the jury trial. Further, counsel for both sides agreed after trial that neither side desired at this time to make any further presentation of evidence to or to seek any further determination by

the jury which served in this case. In that connection both sides understand and agree that if an appeal taken herein by one or both sides should result in a remand, which in turn should require trial of the 34(g) affirmative defense issue, a jury other than the jury which returned the answers to the 52 Special Questions in this case would need to be empanelled to answer such questions as are put to the jury in a further trial.

## RESCISSIONAL DAMAGES UNDER RULE 10b–5

Plaintiffs seek "rescissional damages" under Counts IV and V pursuant to section 10(b) of the '34 Act and Rule 10b–5. The doctrine of "rescissional damages" seems to have originated, at least in 10b–5 law, with the decision in *Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), in which (at 741) Judge Lay held:

> * * * [I]n an action at law a jury may award recisional *damages* if the contract has already been mutually rescinded or is otherwise set aside by law. * * *

Judge Lay noted (at 742) that section 29(b) of the '34 Act automatically voids a sale once a violation of Rule 10b–5 has been found and that therefore a plaintiff who has established such a violation is entitled to seek money damages equivalent to restitution of what he has sold.

In *Baumel v. Rosen,* 412 F.2d 571 (4th Cir. 1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970), in the course of consideration of the remedy of rescission in a 10b–5 case, Judge Bryan wrote (at 574–75):

> * * * Rescission is a radical move, and the law exacts the election of that course to be asserted without wait. The demand is that advice of the determination be given within a reasonable time after discovery of the ground for rescission.

> This principle is stringently administered. Reasonable time is inceptive from the receipt by the rescinder of word putting him on notice. It is then incumbent upon him to pick up the scent and nose to the source. * * * If the quest confirms the suspicion, then he must make decision with reasonable dispatch. Failing this, entitlement to rescission disappears.

> * * * * * *

> Further rationale for the requirement of immediacy is that every day's lapse renders more difficult the very aim of rescission: to return the parties to statu quo ante. That obviously is well exampled here. [Citation omitted.]

■■ In *Johns Hopkins University v. Hutton,* 488 F.2d *supra* at 917, Judge Field quoted from the above language from *Baumel* and stated that "it was not any unique factual contours of *Baumel* which provoked Judge Bryan to state the principle which we find applicable to the present case:", namely, that in order to obtain rescission in a 10b–5 action the plaintiff must act with all reasonable dispatch after he either has actual knowledge of the fraud or notice of facts which, in the exercise of due diligence, should lead him to acquire knowledge thereof. Herein, since, as discussed *supra* in relation to plaintiffs' 12(2) cause of action, the Foxes should have had knowledge of the untruths or omissions at least one year before they instituted the within suit on June 2, 1971, the Foxes did not thereby act with "reasonable dispatch". Thus, they are not entitled to obtain either rescission or rescissional damages assuming the doctrine of "rescissional damages" to be applicable and assuming one or both of those remedies to be otherwise available to plaintiffs.

Special Question XXVII put to the jury read:

> Have plaintiffs, after they had, or should reasonably have had, information which should have led them to seek to discover whether a defendant

made any untrue statement of material fact or omitted to make any statement of material fact, made, with all reasonable promptness, all reasonable efforts to discover detailed information concerning the same and thereafter to institute this suit as promptly as practically possible?

The jury answered in the affirmative. But that answer is totally without support in the record. Once again, while there was not sufficient evidence to go to the jury on that point, this Court submitted the same to the jury on the basis of the above referred to *Phoenix* approach. However, the state of the evidence now requires, and this Court at this time grants a judgment notwithstanding the answer to Question XXVII and hereby answers that question in the negative. Accordingly, plaintiffs may not obtain rescissional damages under Counts IV and/or V, even "if the contract [of May 1969] has already been mutually rescinded" (which is not the case) or even if the contract [of May 1969] is otherwise set aside by law" (which would also appear not to be the case). *See* the above-quoted language from *Myzel v. Fields, supra* at 741.[13]

### COUNTERCLAIM

Without waiving their affirmative defenses of release, waiver and estoppel based upon the December 1970 Settlement Agreement, defendants stated their counterclaim based upon the grounds that, at the time the Foxes entered into the Settlement Agreement with K–M, the Foxes had already determined to file the within type of suit, that that determination to sue was a material fact to K–M in the context of K–M's taking from and receiving back K–M stock from the Foxes, *i. e.,* that such taking from and receiving back by K–M was the same in legal effect as a purchase by K–M of its own stock from the Foxes, that the Foxes' intent to sue was a fact

material and adverse to K–M and therefore to the then value of each of K–M's shares of stock, and that therefore the Foxes omitted to reveal to K–M a material fact when the December 1970 Settlement Agreement was negotiated and consummated. Put another way, K–M contends that the Foxes' said alleged failure to disclose their then existing intention to sue K–M caused K–M to settle the inventory dispute for less than K–M would have demanded if K–M had known of that intention to sue. Additionally, K–M argues that if it had known of the Foxes' intention to sue, K–M would not have settled the inventory dispute for less than a complete release. K–M seeks as damages under its counterclaim the total of any judgment awarded against K–M in the case in chief brought by the Foxes plus K–M's legal fees incurred in defending this case.

In support of its counterclaim, K–M offered evidence which showed that in September 1970 a suit had been initiated against K–M in the United States District Court for the Western District of Pennsylvania, *Dwyer et al. v. Kane-Miller Corp.,* C.A. 60–70 Erie (W.D.Pa. February 2, 1973), *aff'd,* 487 F.2d 1394 (3d Cir. 1973). That suit was brought by the former owners of the Firch group of companies which had been acquired by K–M during the latter part of June 1969, within one month after the Fox acquisition. K–M offered evidence at trial which tended to show that the complaint filed in the *Dwyer* case resembled very closely the original complaint brought in this action.

The jury in this case was informed that the *Dwyer* case had been brought and that it had been brought under circumstances somewhat similar to those in this case, but the jury was not informed that K–M obtained a defendant's judgment in the *Dwyer* case after the within case was instituted by

---

13. Nor, unless an "end-run" around the doctrine of *Baumel* is to be permitted, may plaintiffs obtain the award of "rescissional" type damages under the label of "restitution". *See* n. 10 *supra.*

the Foxes since this Court tentatively expressed the belief before trial, and concluded during trial, that while the fact of that result might well be relevant and material herein, the jury's knowledge of that result might also, on balance, have unduly prejudiced the right of the Foxes to have the instant litigation determined on its own facts.

■ Even assuming that the legal theory upon which K–M's counterclaim is based supports a 10b–5 or a common law fraud action, the jury's answers to Special Questions XXXII and XXXIII, in which answers it found that K–M had failed to establish that the Foxes, in the period leading up to and including the date the Settlement Agreement was entered into, either made any untrue statement of material fact or omitted to make any necessary statements about any material facts to K–M, are substantially supported by evidence in the case. Accordingly, the Foxes are entitled to judgment as to the counterclaim in both the 10b–5 and common law fraud contexts in which the counterclaim is stated.

### THE SLOVIN—LOEBER LANDAU LETTER

■ On March 26, 1969 Andrew Heine, a partner in the law firm that handled K–M's legal affairs, telephoned David Berliner of the Securities and Exchange Commission in Washington, D. C. and inquired about the effect that the acquisition of Carolina would have on the outstanding registration statement pursuant to which shares of K–M were being sold in a secondary distribution by a group of K–M shareholders (the February 5th Prospectus was drawn up for that offering). Berliner informed Heine that Carolina was a material acquisition and consequently no shares covered by that registration statement could be offered for sale until the registration statement was amended. That understanding was confirmed by a letter from Heine to Berliner dated March 26, 1969. Heine then informed Bruce Slovin of K–M of that information.

The next day Slovin wrote to W. Loeber Landau of the law firm which was acting as counsel for the selling shareholders who were covered by the registration statement. That letter was also sent to fourteen people and institutions which were participating in the secondary offering. It was not sent to the Foxes. The relevant parts of that letter are appended in the margin.[14]

The question arose before and during trial as to whether plaintiffs should be permitted to introduce the letters into evidence. K–M contended that since the letters referred to shares which were not used by K–M to acquire the Fox Companies, the letters were irrelevant. Moreover, K–M complained of alleged prejudicial effect upon the jury if its members learned that the Securities and Exchange Commission, a government agency, felt that the February 5, 1969 Prospectus, a copy of which had been furnished to the Foxes, was apparently deemed not up to date during the period K–M negotiated with the Foxes. By way of contrast, the Foxes contended that the letters were relevant because the Berliner letter was evidence that K–M had been put on notice that the Carolina acquisition was a material change and therefore, seemingly, one about which K–M should have informed the

14. Please be advised that Kane-Miller Corp. acquired Carolina-By-Products Company, Inc. and subsidiareis [sic] yesterday, March 26, 1969. Inasmuch as this was a material acquisition for Kane-Miller, we are in the process of amending the registration statement which became effective February 5, 1969.

We have been advised by the Securities and Exchange Commission that the prospectus in question is no longer up-to-date because of the acquisition and, therefore, the sale of all Kane-Miller debentures and common stock included in the registration statement must terminate until the amendment to said registration statement is effective. We expect the amendment, which may include another material acquisition, to be filed before the end of April, 1969.

Foxes (which of course K–M contends it did), and because the Berliner letter stands as evidence that K–M itself was on notice on March 26, 1969 that the Prospectus was not at that date an entirely accurate picture of K–M's then current financial affairs. K–M's counsel informed this Court that in the *Dwyer* case Judge Joseph P. Willson refused to admit the letters into evidence. However, in the context of this case, this Court determined that the Foxes' reasons in favor of admissibility were persuasive—and accordingly held the two letters relevant and admissible.[15] Because, however, of the possible prejudicial effect of the letters against the defendants, the two letters were admitted into evidence with cautionary remarks made by this Court to the jury, which contained the following statement:

> You are informed that the parties agree that Kane-Miller Corp. and its attorneys handled the discussions with the SEC and the information forwarded to Mr. Landau strictly in accordance with applicable law and regulations. The said two exhibits are of relevance in this case only to the extent that they bear upon the materiality of the acquisitions referred to in the said two letters and disclosure of material information by Kane-Miller Corp. and the other defendants to the Foxes. Counsel on both sides and this

Court agree that there is no basis for any inference of wrongdoing in those letters or in the conversations between Mr. Heine and Mr. Berliner and that that matter was handled by Kane-Miller Corporation and its attorneys in accordance with law and regulations.

While consenting to the language used in that mid-trial cautionary instruction to the jury, K–M did not waive its objection to the admissibility of the Loeber Landau letter or any reference to it by counsel for the Foxes. That objection was thus preserved for possible appeal. In the opinion of this Court, with the cautionary remarks to the jury quoted *supra*, the probative value of the Loeber Landau letter was not "substantially outweighed by the danger of unfair prejudice," [16] and in the exercise of a trial court's discretion as to relevancy of proof [17] and extent of prejudice,[18] both the Loeber Landau and the Heine letters were properly admitted into evidence.

### COUNT VIII—COMMON LAW FRAUD

█ Count VIII of the complaint alleges that K–M committed common law fraud against the Foxes in connection with the May 1969 Agreement. While the burden of proof, *i. e.*, clear and convincing evidence, *see Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 517, 255 A.2d 332 (1969), and the ele-

15. Rule 401 of the Federal Rules of Evidence provides, in part:
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 While the Federal Rules of Evidence will not take effect until July 1, 1975, they provide a good example of modern thinking as to relevancy.

16. Rule 403 of the Federal Rules of Evidence provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence.

17. *See* Beaty Shopping Center, Inc. v. Monarch Ins. Co. of Ohio, 315 F.2d 467, 471 (4th Cir. 1963), quoted in Springer et al. v. Joseph Schlitz Brewing Co., 510 F.2d 468, 479 (4th Cir. 1975) (Widener, J., concurring and dissenting):
 The determination of the relevancy of proof offered at the trial is a matter resting largely within the sound discretion of the trial court, and is not ordinarily reviewable upon appeal. 20 Am.Jr. Evidence section 247; 31 C.J.S. Evidence §§ 158, 159, and cases cited.

18. Construction Ltd. v. Brooks Skinner Building Co., 488 F.2d 427, 431 (3d Cir. 1973).

ments which must be established in a common law fraud action may in many respects place a heavier duty on a plaintiff therein than in actions grounded in some of the provisions of the '33 and '34 Acts, the possibility that the applicable limitations period in such a fraud action might be a longer period than the period applicable in actions brought pursuant to those statutory provisions seemingly caused plaintiffs to press their common law fraud complaint. In that connection, it is to be noted that the general three-year limitations period in Maryland includes actions of fraud, Md. Ann.Code, *Cts. & Jud.Proc.* § 5–101 (1974), whereas, as discussed *supra,* the applicable limitations period in a 12(2) action is clearly shorter, and as discussed *infra,* the applicable period in a 10b–5 action might be shorter.

■ An issue such as common law fraud presents a question which is to be determined by applicable state law, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), in this case either Maryland or New York law. The parties have agreed that the applicable legal principles developed by the courts of those two states do not materially differ and that the Maryland decisions fairly reflect those principles. In *Casale v. Dooner Laboratories, Inc.,* 503 F.2d 303 (4th Cir. 1973), Judge Craven wrote:

Under the law of Maryland, the elements of actionable fraud are these: (1) a false representation, (2) knowledge of its falsity or such reckless indifference to truth so as to impute knowledge, (3) that the false representation was made for the purpose of defrauding another, (4) that the other person relied upon the misrepresentation, had the right to rely upon it, believed it to be true, and embarked upon a course of conduct he would not have chosen but for the misrepresentation, and (5) damage directly resulting from the false representation. *James v. Goldberg,* 256 Md. 520, 261 A.2d 753, 758 (1970); Appel v. Hup-

field, 198 Md. 374, 84 A.2d 94, 95–96 (1951).

In *Canatella v. Davis,* 264 Md. 190, 198, 286 A.2d 122, 126 (1972), Judge Smith commented:

The criteria for recovery in an action of deceit were set forth by Judge Marbury for the Court in *Suburban Properties Mgmt. Inc. v. Johnson,* 236 Md. 455, 204 A.2d 326 (1964):

"The elements of legal fraud are: (1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation.

It appears that a fraud action, grounded entirely on non-disclosure, may well exist in Maryland.

* * * This evidence was properly submitted to the jury so that it could consider whether appellant intentionally concealed material facts in order to obtain appellee's money. Where such concealment effectively suppresses material facts with the object of creating or continuing a false impression, a cause of action based on fraud may arise. *Fegeas v. Sherrill,* 218 Md. 472, 147 A.2d 223 (1958).

*Levin v. Singer,* 227 Md. 47, 64, 175 A. 2d 423 (1961).

The jury's answers in the affirmative to Questions XXII through XXVI in and of themselves support a judgment against K–M based on common law fraud committed by intentional concealment of a material fact. Those ques-

tions asked the jury to find whether the Foxes had "established by clear and convincing evidence" that: (1) K–M "omitted to make [a] statement of material fact in writing or orally to [the Foxes] for the purpose of defrauding [them]" and (2) whether the Foxes "fully believed that complete disclosure had been made to them and that they would not have entered into the transaction in the manner in which they did if they had known of such omission of material fact".

The parties have stipulated, and it would appear to be legally correct in the factual context of this case, that the measure of damages for recovery under the Rule 10b–5 action and the common law fraud action are substantially the same.[19] Accordingly, any recovery under Count VIII, the fraud count in this case, is the same as under Counts IV and V, the 10b–5 counts.

▮ Since, as set forth *infra*, the Foxes are entitled to judgment under Counts IV and V, *i.e.*, their 10b–5 actions, the entry or non-entry for them of judgment under Count VIII is of little import.[20] Nevertheless, while this

---

**19.** As to the 10b–5 measure of damages, *see* the discussion *infra* in the body of this opinion. As to the Maryland rule, *see* Dassing v. Fred Frederick Motors, Inc., 240 Md. 621, 624, 214 A.2d 925, 926 (1965) :

> * * * The proper measure of damages in this State, in an action such as this where fraud or misrepresentation is alleged, is the difference between the amount of the purchase price the buyer has paid and the actual worth of the object purchased on the date it was sold. *Standard Motor Co. v. Peltzer*, 147 Md. 509, 514, 128 A. 451.

But *compare*, Hinkle v. Rockville Motor Co., 262 Md. 502, 278 A.2d 42 (1971), which indicates that Maryland would not rigidly follow the "out-of-pocket" theory and that (at 512, 278 A.2d at 47) "where * * * the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed." *Quoting* Selman v. Shirley, 161 Or. 582, 609, 85 P.2d 384 (1938). However, in this case there was no claim or proof of damages under the benefit-of-the-bargain rule ; rather, plaintiffs sought, primarily, "rescissionary" damages ; secondarily, "out-of-pocket" damages.

**20.** That is seemingly entirely true insofar as any "end result" in this case is concerned. Defendants, however, have expressly indicated their considerable concern about an adverse judgment on the basis of common law fraud, and contend strongly that there is no factual or legal basis for such a judgment. As to the facts, it is apparent, from the jury's answers that the jury believed Frederick Fox and disbelieved the Kanes and Slovin. Whether this Court, as a fact finder, would have attached the same credibility and reliability, and lack thereof, to testimony in this case is of little importance. In so stating, this Court has well in mind Judge Parker's clear and strong statement in Garrison v. United States, 62 F.2d 41, 42 (4th Cir. 1932), which is quoted verbatim by Judge Parker in Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350, 354 (4th Cir. 1941) :

> * * * Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side ; for, under the constitutional guaranty of trial by jury, it is for the jury to weigh the evidence and pass upon its credibility. He may, however, set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false ; for, even though the evidence be sufficient to preclude the direction of a verdict, it is still his duty to exercise his power over the proceedings before him to prevent a miscarriage of justice. * * *

Defendants urge, at the very minimum, that this Court grant a new trial as to Count VIII. But if the fact finder attaches to the testimony reliability and credibility, and the lack thereof in the manner in which it seems rather clear the jury did in this case, then this is not a case in which "the verdict [as to Count VIII] is contrary to the clear weight of the evidence * * *". (*Id.*) Nor is this a case in which this Court believes that a new trial as to Count VIII is "necessary to prevent a miscarriage of justice." (*Id.*)

In that connection, this Court notes that while the record in this case would convince this Court as a fact finder that a person with the experience and background of Frederick Fox would have understood and known far more than Fox testified he understood

Court, sitting non-jury, would not as a fact-finder have answered Questions XXII and XXVI in the affirmative in the context of the clear and convincing burden of proof embodied therein, the record contains sufficient evidence for the jury so to conclude if its members totally accepted the credibility and the reliability of the testimony of Frederick Fox and other plaintiffs' evidence and totally rejected that of the Kanes, Slovin and other defendants' evidence.

and knew, the record itself permits a jury to find to the contrary without bringing about "a miscarriage of justice". Further, the demeanor of the witnesses in this case—i. e., the rather calm, self-deprecating manner of Frederick Fox as opposed to the certain, insistent and somewhat arrogant manner of at least several of the witnesses called by defendants—and the possible effect thereof upon the jury, regardless of its effect upon this Court, cannot be totally disregarded.

In sum, this Court concludes that there is a fair basis for the Count VIII judgment as to liability. By way of contrast, as discussed *infra* in the body of this opinion, there is no such fair basis upon which this Court can enter a damage award in the amount seemingly indicated by the jury's answers to certain of the special questions.

As to the law, defendants contend that the principles enunciated in Levin v. Singer, *supra*, and Fegeas v. Sherrill, cited in the quotation (at p. 634 *supra*) from the Levin case, require that since the jury's answers to one or more of the special questions disclose that defendants made no false statements or representations and since there is an absence of any evidence as to defendants either preventing or attempting to prevent plaintiffs from acquiring information, and apparently also an absence of any evidence of the existence of any fiduciary or other confidential relationship between plaintiffs on the one hand and defendants on the other hand, during the bargaining and contract-entry period in 1969, and an absence of any evidence of the presence during such period of other than an "arms-length" posture by both sides, plaintiffs can prevail under Count VIII only if they have established, by clear and convincing evidence, concealment or nondisclosure by one or more persons, including the use of "half-truths". Defendants urge vigorously that the record does not permit a finding by clear and convincing evidence of any material or relevant "half-truths". *See* Fegeas v. Sherrill, *supra*, 218 Md. at 478, 147 A.2d 223 and the quotation thereat from Swinton v. Whitinsville Sav. Bank, 311 Mass. 677, 678, 42 N.E.2d 808, 809 (1942) utilizing the words "the uttering of a half truth". And yet, if, as the jury seemingly believed and found, the Kanes and Slovin and any other persons employed by or speaking for K–M or any of its subsidiaries during the relevant 1969 period, knew information concerning K–M's financing of acquisitions which was adverse to, or in any event material to a full understanding by the Foxes of K–M's then current financial position and changes occurring in connection therewith, and failed intentionally to disclose it to the Foxes, then such persons did indeed engage in the presentation of "half-truths".

Mention is hereinabove made in the within footnote to the lack of a fiduciary or other confidential relationship between the parties during the February–June 1969 period. The record does reveal that prior to February 1969, plaintiffs had an ownership interest in shares of K–M stock. Whether such an interest created any relationship between the Foxes and K–M which in any way affected the disclosure duty of defendants to plaintiffs during the February–June 1969 period is a question which has seemingly not been presented by counsel in this case and is one which this Court does not find it necessary to consider in this case.

Defendants take the position that only the Slovin-Loeber Landau letter, and testimony before and argument by plaintiffs' counsel to the jury relating to that letter (*see* the discussion at pp. 632–633 *supra*), provide an appropriate factual and/or legal basis for the jury's answers to questions relating to Count VIII. But the record includes evidence unrelated to the Slovin-Loeber Landau's letter which, if believed, shows that, independently of Berliner's comment to Heine and Slovin's letter to Landau with copies to others, defendants knew of relevant financial information pertaining to K–M during the negotiations, contract-entry period which information defendants intentionally withheld from the Foxes. Additionally, this Court is of the opinion that testimony relating to the Slovin-Loeber Landau letter was properly admitted, and that this Court's instructions to the jury (quoted at p. 633 *supra*) adequately and fully handled any problems raised by the admission of such testimony and/or caused by argument presented to the jury by plaintiffs' counsel.

In sum, for the reasons set forth in the body of this opinion and in the within footnote, this Court holds the view that there is evidence sufficiently clear and convincing to support a finding that defendants engaged in the presentation to plaintiffs of "half-truths" which under Maryland case law requires this Court, in the light of the jury's answers to certain of the questions put to it, to enter judgment under Count VIII for plaintiffs.

## LIMITATIONS IN AND ELEMENTS OF A 10b–5 ACTION

There is no limitations period provided by federal statute as to civil liability under Rule 10b–5. Indeed, that liability itself is not provided explicitly by statute but rather has been judicially implied from the Rule. That lack of a limitations period is to be contrasted with the very explicit limitations period provision for civil liability under section 12(2) of the '33 Act as set forth in section 13 of that Act and discussed *supra*.

The Foxes instituted this case on June 2, 1971 against Kane-Miller Corp. and on July 22, 1971 added by amending their complaint under Federal Civil Rule 15, the individual defendants. As related *supra*, all relevant events occurred less than three years before either of those dates, but more than one year before both of those dates, and some of them occurred more than two years before one or both of those dates.

 Limitations is a defense cautiously to be applied. *See, e.g., Burnett v. N. Y. Central R. Co.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965). The '34 Act—and Rule 10b–5 of it—constitute remedial legislation, liberally to be construed. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *Herpich v. Wallace*, 430 F.2d 792, 801 (5th Cir. 1970). "[T]he broad remedial policies of the federal securities laws are best served by a longer, not a shorter, statute of limitation." (Footnotes omitted.) *United California Bank v. Salik*, 481 F.2d 1012, 1015 (9th Cir. 1973), *cert. denied*, 414 U.S. 1004, 94 S. Ct. 361, 38 L.Ed.2d 240 (1974). Further, with specific reference to 10b–5 actions, they occupy, insofar as the ele-

ments of the case, and also a plaintiff's burden of proof are concerned, an intermediate position between common law fraud and the all but strict liability provisions of section 12(2). Thus, a 10b–5 plaintiff need not make out all of the elements of common law fraud to recover in a 10b–5 case. *Kubik v. Goldfield*, 479 F.2d 472, 476 n.6 (3d Cir. 1973); *SEC v. Manor Nursing Centers, Inc.*, 458 F. 2d 1082, 1096 (2d Cir. 1972); *Douglass v. Glenn E. Hinton Investments*, 440 F. 2d 912, 915 (9th Cir. 1971). On the other hand, while a 12(2) defendant must prove he did not have, and should not reasonably have had, scienter, a 10b–5 plaintiff must make a showing of something resembling traditional scienter by the defendant before he can recover.[21] Moreover, a 12(2) plaintiff, as opposed to a 10b–5 plaintiff, need not prove any reliance. *Compare Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970), *with Johns Hopkins University v. Hutton*, 488 F.2d 912, 914–15 (4th Cir. 1973), *and Baumel v. Rosen*, 283 F.Supp. 128, 140 (D.Md. 1968) (Winter, J., sitting by designation as a district judge), *aff'd in part and rev'd in part on other grounds*, 412 F.2d 571 (4th Cir. 1969) (seemingly *aff'd*, at 573, as to the point of this citation), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970). *See also Johns Hopkins University v. Hutton*, 297 F. Supp. 1165, 1222–23 (D.Md.1968), *aff'd in part and rev'd in part on other grounds*, 422 F.2d 1124 (4th Cir. 1970), *and compare it with* 326 F.Supp. 250, 257–60 (D.Md.1971), *aff'd in part and rev'd in part*, 488 F.2d 912 (4th Cir. 1973). Additionally, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584 (1975).

---

21. Johns Hopkins University v. Hutton, 343 F.Supp. 245, 251 (D.Md.1972), *aff'd in part, rev'd in part*, 488 F.2d 912 (4th Cir. 1973). *See* Carras et al. v. Burns, et al., 516 F.2d 251, 256 (4th Cir. 1975). *Compare, e. g.*, Myzel v. Fields, 386 F.2d 718, 734–35 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S. Ct. 1043, 19 L.Ed.2d 1143 (1968), *with, e. g.*, Cohen v. Franchard Corp., 478 F.2d 115, 123 (2d Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973).

However, in a non-disclosure case such as the within case, given the inherent difficulty in proving reliance on the negative of an omitted statement, the role of reliance may be a limited one. *See Carras et al. v. Burns et al.*, 516 F.2d 251, 257 (4th Cir. 1975); 2 A. Bromberg, Securities Law: Fraud: Sec. Rule 10b–5 § 8.6 at 209 (1967); Note, 88 Harv.L.Rev. supra at 590–92.[22] In any event, against that background, it is certainly arguable that a 10b–5 plaintiff who is required to prove more than a 12(2) plaintiff should be allowed a longer period to discover his cause of action.[23]

In a case in which a federal cause of action existed without statutory provision of an explicit statutory limitations period, Mr. Justice Stewart has written that the timeliness of the action "is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations." *International Union v. Hoosier Cardinal Corp.*, 383 U.S. 696, 705, 86 S.Ct. 1107, 1113, 16 L.Ed.2d 192 (1966) (footnote omitted). With respect to the particular problem before this Court, *i.e.*, that of selecting the appropriate limitations period in a 10b–5 action, the Ninth Circuit has commented:

> In the absence of an applicable federal statute of limitation, the question of which local limitations period is appropriate calls for a consideration of the objectives of the substantive federal statute and how they can best be achieved. *See* International Union, United Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). This is quite different from our duty in cases involving rights derived from state law where federal courts must approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum. *See* Holmberg v. Armbrecht, 327 U.S. 392, 395, 66 S.Ct. 582, 90 L. Ed. 743 (1946).

*Douglass v. Glenn E. Hinton Investments*, 440 F.2d 912, 915 (9th Cir. 1971).

The question of the appropriate limitations period for 10b–5 actions brought

---

22. While in a 12(2) case, a plaintiff seemingly has little or no duty to investigate prior to entering into the transaction and/or to protect himself, *see* Johns Hopkins University v. Hutton, 297 F.Supp. *supra* at 1220–21, that duty may well be different in a 10b–5 case. *See also* Johns Hopkins University v. Hutton, 343 F.Supp. *supra* at 257, 260, *aff'd in part and rev'd in part*, 488 F.2d *supra*, but seemingly *aff'd* (at 914) as to the point of this citation. A defendant in a 10b–5 case cannot successfully simply take the position that the information was available if the plaintiff had asked for it. "Readiness and willingness to disclose are not equivalent to disclosure." Hughes v. SEC, 85 U.S. App.D.C. 56, 174 F.2d 969, 976 (1949). Further, a defendant cannot claim that he adequately disclosed omitted material by making available the same among his corporate books or other bulky compilations so as, in effect, to bury the same. *See* Stier v. Smith, 473 F.2d 1205, 1208 (5th Cir. 1973); Dale v. Rosenfeld, 229 F.2d 855 (2d Cir. 1956). Pertinent also is Chief Judge Brown's observation in *Stier, supra* at 1208, that "the law will presume that plaintiff would have wanted to know the information if he had an inkling of its existence."

(Footnote omitted.) And yet, it may well be that a 10b–5 plaintiff has some burden to investigate before entering into the transaction. See Financial Industrial Fund, Inc. v. McDonnell Douglas Corporation, 474 F.2d 514, 517, 521 (10th Cir.), cert. denied, 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973); Evans & Co. v. McAlpine, 434 F.2d 100, 103–04 (5th Cir. 1970), cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971); City Nat'l Bank of Ft. Smith, Ark. v. Vanderboom, 422 F.2d 221, 230–31 (8th Cir.), cert. denied 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970); Kohler v. Kohler, 319 F.2d 634, 641–42 (7th Cir. 1963).

23. In that regard, compare the proposed Federal Securities Code, § 1421(c) (Tent. Draft No. 2, March 1973), which seemingly provides that in the majority of private securities actions no such case "may be brought (1) more than two years after discovery of the underlying facts, except that the period is tolled while a plaintiff (in the exercise of reasonable care) remains in ignorance of those facts, or (2) more than four years after the action accrued."

in this District has been considered three times. In *Baumel v. Rosen,* 283 F.Supp. *supra* at 143, Judge Winter, with specific reference to the three-year fraud limitations period then set forth in 5 Md.Ann.Code art. 57, § 1,[24] wrote:

> In Maryland, where the transactions complained of occurred, and the state in which the Court is sitting, the period of limitations for actions based on common law fraud, or the analogous cause of action in Count 1 [10b–5] is three years. * * *

The transactions complained of in *Baumel* occurred in 1959 and the suit was filed in 1962. In *Hopkins* (343 F. Supp. *supra* at 251), the events occurred in 1961 and the case commenced in 1963. Therein, this Court applied the three-year limitations period with respect to the 10b–5 action.

On June 1, 1962, the Maryland Securities Act, 3 Md.Ann.Code art. 32A, §§ 13–44, became effective. Section 34 of that Act contained a civil liability provision modeled after that in section 410 of the Uniform Securities Act which, in turn, was essentially modeled after section 12(2). In *Batchelor v. Legg,* 52 F. R.D. 553 (D.Md.1971), Judge Harvey, in the course of granting summary judgment to the defendant on the ground that the limitations bar existed, and in a case in which the Court's major focus was upon when the limitations period began to run rather than upon whether the limitations period was two years or three years, stated (at 558):

> After reviewing the authorities, this Court concludes that the controlling limitations period [for a 10b–5 action] is that contained in § 34 of Article 32A of the Maryland Annotated Code, as it existed before this statute was amended in June of 1968 * * *.

Prior to its amendment in 1968, section 34(e) read in part:

> No person may sue under this section more than two years after the contract of sale.

Presently, that section, since amendment in 1968, reads in part:

> No person may sue under this section more than three years after the contract of sale; provided, however, that no action shall be maintained to enforce any liability created under subsection (a)(1) of this section unless brought within one year after the violation upon which it is based, and that no action shall be maintained to enforce any liability created under subsection (a)(2) of this section unless brought within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence * * *.

---

24. That section provided:

 1. Actions other than those upon specialties.

All actions of account, actions of assumpsit, or on the case, except as hereinafter provided, actions of debt on simple contract, detinue or replevin all actions for trespass for injuries to real or personal property, all actions for illegal arrest, false imprisonment, or violation of the twenty-third, twenty-sixth, thirty-first and thirty-second articles of the Declaration of Rights, or any of them, or of the existing, or any future provisions of the Code touching the writ of habeas corpus or proceedings thereunder, and all actions, whether of debt, ejectment or of any other description whatsoever, brought to recover rent in arrear, reserved under any form of lease, whether for ninety-nine years renewable forever, or for a greater or lesser period, and all distraints issued to recover such rent shall be commenced, sued or issued within three years from the time the cause of action accrued; and all actions on the case for libel and slander and all actions of assault, battery and wounding, or any of them, within one year from the time the cause of action accrued. Presently, Md.Ann.Code, *Cts. & Judg.Proc.* § 5–101, which is derived from article 57, section 1, provides:

 **§ 5–101. Three-year limitation in general.**

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

That amendment became effective on June 1, 1968. The occurrences involved in this action did not begin until February 1969.

The *Batchelor* approach of establishing a limitations period in a 10b–5 case equal to that provided by the special securities statute of the forum jurisdiction has been adopted recently by a number of courts. *See, e. g., Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996, 999–1000 (5th Cir. 1974); *Parrent v. Midwest ·Rug Mills, Inc.,* 455 F.2d 123, 125–28 (7th Cir. 1972); and *Vanderboom v. Sexton,* 422 F.2d 1233, 1236–40 (8th Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). Pursuant to that approach the applicable limitations period herein as to the Foxes' 10b–5 counts would seemingly be one year. However, *Douglass v. Glenn E. Hinton Investments,* 440 F.2d 912 *supra,* suggests a different solution.[25] The Ninth Circuit, after having earlier adopted a State of Washington general fraud statute of limitations as applicable in a 10b–5 action, in *Fratt v. Robinson,* 203 F.2d 627 (9th Cir. 1953), an approach which it followed in several subsequent cases intervening between *Fratt* and *Douglass,* was faced in *Douglass* with the need to choose between adhering to that selection or adopting a special Washington limitations statute for securities fraud which had been adopted in the interim. Although the focus of the Court's attention in *Douglass* appeared to be on the different tolling provisions rather than on the lengths of the periods, the Court's reasoning is seemingly relevant to the latter question also. In *Douglass,* the Court wrote (*inter alia,* at 916):

> * * * [F]or us to change the applicable limitation period because the local law of securities regulation has changed would add an unnecessary uncertainty to the prosecution of federal claims under section 10(b). We do not believe federal policy is advanced by changing the law governing the timeliness of federal claims to correspond with each change in the substantive elements of a claim under the local securities law. Aggrieved persons have come to rely upon our prior holdings. Reasonable stability in laws pertaining to voluntary relationships between parties, and the right of access to the courts to question those relationships, is a worthwhile objective as well. [Footnote omitted.]

That langage in *Douglass* was quoted and followed in the later case of *United California Bank v. Salik,* 481 F.2d 1012, 1015 (9th Cir. 1973), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1974).

 While state statutory law is looked to for guidance as to limitations when there is no federal statutory limi-

---

25. *And see also* Klein v. Shields & Co., 470 F.2d 1344 (2d Cir. 1972) *following* Klein v. Bower, 421 F.2d 338, 343 (2d Cir. 1970). *See also* Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 (2d Cir. 1951), in which reference is made to New York fraud limitations period. Where the state, whose limitations provisions are looked to, does not have a blue sky type of law, or a law modeled on the federal securities statutes as for instance Maryland does, there is no need to choose between the fraud limitations period on the one hand and the special statutory limitations period or periods on the other hand, nor to resolve the question of what should be done if the state changes its limi-borrowed from that state's fraud limitations approach before that state has enacted any special statutory provisions. With regard to the last-mentioned problem in *Douglass,* in the course of discussing the issue in that case and issues before the Ninth Circuit in earlier cases, Judge Hamley referred (at 914–15) to the limitations approaches of the states of Washington and California. With regard to the problem of choosing as a matter of first impression between a special state statutory limitations period for securities cases on the one hand and a general state fraud limitations period on the other hand, while, as discussed *supra* in the body of this opinion, some courts have chosen to apply state blue sky like limitations periods, at least one court has chosen to apply a general fraud limitations period. *See* Charney v. Thomas, 372 F.2d 97, 99–100 (6th Cir. 1967).

tations period, the resulting law is federal and not state since the right of action being enforced is federally and not state created. Accordingly, once a federal court has established a 10b–5 limitations period by looking to the *then* most analogous state cause of action, it would seem that a federal court should not, because of subsequent changes in state statutory law, move its own federal 10b–5 limitations period up and down like a yo-yo on a string. Rejecting, as has the Ninth Circuit, that yo-yo approach, the limitations period, applicable in a 10b–5 case brought in this forum, will not be lowered in this case to one year simply because of the 1968 Maryland amendment reducing the period to one year with respect to actions under Maryland's equivalent of 12(2). Further, because of the many differences between 12(2) and 10b–5, a number of which have been discussed or alluded to *supra*, placing lesser burdens on a 12(2) plaintiff as compared with a 10b–5 plaintiff, this Court believes that the limitations period in a 10b–5 action should be longer than in a 12(2) action. *Batchelor* adopted two years; *Baumel*, three years. Herein, it is not necessary to decide which of the two is more appropriate. The Special Questions submitted to the jury in this case included several whose purpose was to elicit the precise date on which the limitations period should be deemed to have begun to run. In the answers to Special Questions VIII and XI,[26] the jury found that the Foxes did

not know, and in the exercise of reasonable care should not have known, of the material omissions complained of in this case until after December 31, 1971, less than six months prior to the filing of this suit. As discussed *supra*, in the context of the Foxes' 12(2) action, this Court concludes that the evidence does not support a finding of fact that, as they must under section 13 with respect to the 12(2) count in this case, the Foxes have borne the burden of proving that they should not have known of the alleged omissions on or before June 3, 1970. However, the same is not true with regard to whether defendants, asserting a limitations defense to the 10b–5 count in which defendants have the burden of proof, have not failed to meet that burden with relation to the June 3, 1969 date. The jury's determination that defendants did not prove that the Foxes knew or should have known of the omissions on or before that date, *i. e.*, June 3, 1969, is not without sufficient evidentiary support. Accordingly, whether the applicable limitations period is two or three years, the Foxes' 10b–5 claim is not barred by limitations.

### LIABILITY UNDER 10b–5

Section 10(b) of the '34 Act, 15 U.S. C. § 78j, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of

---

26. Question VIII read as follows:
Have plaintiffs established by a preponderance of the evidence that plaintiffs did not know of such material untruths or omissions on or before any one of the following seven dates:
on or before May 13, 1969?
Yes ——— No ———
on or before June 3, 1969?
Yes ——— No ———
on or before July 22, 1969?
Yes ——— No ———
on or before May 13, 1970?
Yes ——— No ———
on or before June 3, 1970?
Yes ——— No ———

on or before July 22, 1970?
Yes ——— No ———
on or before December 31, 1970?
Yes ——— No ———
Question XI read as follows:
Have defendants established by a preponderance of the evidence that plaintiffs, by the exercise of reasonable diligence or care, should have known of such untruths or omissions on or before any one of the following seven dates:
[the same seven dates set forth above in Question VIII]
The jury answered "yes" as to each part of Question VIII and "no" as to each part of Question XI.

any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

■ There is no longer any question that there is a private right of action implied for violation of Rule 10b–5, *See Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Originally, the common law of deceit pro-

vided the federal courts with helpful analogies in working out the contours of a 10b–5 private cause of action. *See* 3 L. Loss, Securities Regulation 1430–44 (2d ed. 1961). The five elements of common law deceit or fraud are those stated *supra* in the *Casale* and *Canatella* opinions, namely, (1) a false representation, (2) scienter, (3) defendant's intention that the representation be acted upon, (4) justifiable reliance by plaintiff, and (5) actual resulting damage. *See* W. Prosser, Handbook of the Law of Torts § 105 at 685–86 (4th ed. 1971). But it is now clear, as discussed *supra* at 637–638, that 10b–5 liability can be found even in the absence of one or more of the elements of common law fraud. The first requirement seems compelled by the language of the rule, as long as misrepresentation is read as including omissions as well as misstatements—a reading not always embodied in common law fraud decisions. The last requirement is necessary for the plaintiff to obtain damages other than punitive damages (which the Foxes have not sought herein). The third requirement, one related to privity between defendant and plaintiff, may not be a necessary element of a 10b–5 action. *See SEC v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied sub nom., Kline v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). But, in any event, it is an element unquestionably present in this case in which the Foxes and K–M dealt face to face. As to the elements of reliance and scienter, *see* the discussion *supra* at 637–638.

■ However, those questions as to the roles, and the degree of the roles, of reliance and scienter in a 10b–5 case need not be further probed in this case.[27] The jury's answers to Special Questions II through XVI, to Question XXVIII and particularly to Questions II, VI, XII through XV and XXVIII[28]

---

27. The same is true as to whatever duty the Foxes had to investigate prior to entering into the transaction, *see* n. 22, *supra,* particularly in the light of the jury's answers to Questions IX and XI. *See* n. 28, *infra.*

28. Those questions and answers read:
*QUESTION II*
Have plaintiffs established by a preponderance of the evidence that the defendants, during the period commencing February 10,

Note 28—Continued

1969 and ending June 3, 1969, omitted to make a statement about any material fact necessary for the plaintiffs to know in order to make the information defendants did furnish in writing or orally to plaintiffs during that period not misleading in the light of the circumstances under which such information was so furnished?

Answer Yes ___√___ No _____

If your answer to either Question I or Question II is "Yes", then you are instructed to answer Questions III–XXXI, inclusive, except as otherwise indicated. If your answers to Questions I and II are "No", then you are instructed not to answer Questions III–XXXI, inclusive.

QUESTION III

Have defendants established by a preponderance of the evidence that they did not know that they had made any such untrue statement of a material fact or that they did not know that they had omitted to make any such statement of a material fact, on or before either of the following two dates:

Answer

on or before May 13, 1969?
Yes _____ No ___√___
on or before June 3, 1969?
Yes _____ No ___√___

QUESTION IV

Have defendants established by a preponderance of the evidence that they by the exercise of reasonable care could not have known that they had made any untrue statement of material fact or that they by the exercise of reasonable care could not have known that they had omitted to make any statement of material fact, on or before either of the following two dates:

Answer

on or before May 13, 1969?
Yes _____ No ___√___
on or before June 3, 1969?
Yes _____ No ___√___

QUESTION V

Have plaintiffs established by a preponderance of the evidence that a defendant, when he made an untrue statement of material fact, or omitted to make a statement of material fact, knew of the existence of the fact misstated or omitted, on or before either of the following two dates:

Answer

on or before May 13, 1969?
Yes ___√___ No _____
on or before June 3, 1969?
Yes ___√___ No _____

QUESTION VI

Have plaintiffs established by a preponderance of the evidence that a defendant, when he made an untrue statement of material fact,

or omitted to make a statement of material fact, knew that he had done so, on or before either of the following two dates:

Answer

on or before May 13, 1969?
Yes ___√___ No _____
on or before June 3, 1969?
Yes ___√___ No _____.

QUESTION VII

Have plaintiffs established by a preponderance of the evidence that a defendant, when he made an untrue statement of material fact, or omitted to make a statement of material fact, should have known, by the exercise of reasonable care, that he had done so:

Answer

on or before May 13, 1969?
Yes ___√___ No _____
on or before June 3, 1969?
Yes ___√___ No _____

QUESTION VIII

Have plaintiffs established by a preponderance of the evidence that plaintiffs did not know of such material untruths or omissions on or before any one of the following seven dates:

Answer

on or before May 13, 1969?
Yes ___√___ No _____
on or before June 3, 1969?
Yes ___√___ No _____
on or before July 22, 1969?
Yes ___√___ No _____
on or before May 13, 1970?
Yes ___√___ No _____
on or before June 3, 1970?
Yes ___√___ No _____
on or before July 22, 1970?
Yes ___√___ No _____
on or before December 31, 1970?
Yes ___√___ No _____

QUESTION IX

Have plaintiffs established by a preponderance of the evidence that plaintiffs, by the exercise of reasonable diligence or care, should not have known of such material untruths or omissions on or before any one of the following seven dates:

Answer

on or before May 13, 1969?
Yes ___√___ No _____
on or before June 3, 1969?
Yes ___√___ No _____
on or before July 22, 1969?
Yes ___√___ No _____
on or before May 13, 1970?
Yes ___√___ No _____
on or before June 3, 1970?
Yes ___√___ No _____
on or before July 22, 1970?
Yes ___√___ No _____
on or before December 31, 1970?
Yes ___√___ No _____

are supported by the evidence and are sufficient to make out a 10b–5 case even under the strictest tests.

### DAMAGES

In the within case the Foxes are both buyers and sellers of securities since they sold stock in the Fox Companies and bought K–M stock. However, herein, the Foxes claim only violations of their rights as buyers. In *Occidental Life Ins. Co. v. Pat Ryan & Assoc., Inc.,* 496 F.2d 1255, 1265 n.6, 1269 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974), the Fourth Circuit adopted the following standard for damages in a Rule 10b–5 case:

\* \* \* With respect to damages we draw a distinction between cases where, by fraud, one is caused to buy

Note 28—Continued

*QUESTION X*

Have defendants established by a preponderance of the evidence that plaintiffs knew of such untruths or omissions on or before any one of the following seven dates:
Answer
on or before May 13, 1969?
Yes _____ No _√_
on or before June 3, 1969?
Yes _____ No _√_
on or before July 22, 1969?
Yes _____ No _√_
on or before May 13, 1970?
Yes _____ No _√_
on or before June 3, 1970?
Yes _____ No _√_
on or before July 22, 1970?
Yes _____ No _√_
on or before December 31, 1970?
Yes _____ No _√_

*QUESTION XI*

Have defendants established by a preponderance of the evidence that plaintiffs, by the exercise of reasonable diligence or care, should have known of such untruths or omissions on or before any one of the following seven dates:
Answer
on or before May 13, 1969?
Yes _____ No _√_
on or before June 3, 1969?
Yes _____ No _√_
on or before July 22, 1969?
Yes _____ No _√_
on or before May 13, 1970?
Yes _____ No _√_
on or before June 3, 1970?
Yes _____ No _√_
on or before July 22, 1970?
Yes _____ No _√_
on or before December 31, 1970?
Yes _____ No _√_

*QUESTION XII*

Have plaintiffs established by a preponderance of the evidence that they relied upon any such untrue statement of material fact in entering into the May 13, 1969 agreement?
Answer Yes _√_ No _____

If your answer to Question XII is "Yes", you are instructed to answer Question XIII. If your answer to Question XII is "No", you are instructed not to answer Question XIII.

*QUESTION XIII*

Was such reliance by plaintiffs reasonable?
Answer Yes _√_ No _____

*QUESTION XIV*

Have plaintiffs established by a preponderance of the evidence that they would not have entered into the transaction in the manner in which they did if they had known of such omission of material fact?
Answer Yes _√_ No _____
If your answer to Question XIV is "Yes", you are instructed to answer Question XV. If your answer to Question XIV is "No", you are instructed not to answer Question XV.

*QUESTION XV*

If plaintiffs would not have entered into the transaction in the manner in which they did, would such conduct by plaintiffs have been reasonable?
Answer Yes _√_ No _____

*QUESTION XVI*

Have defendants established by a preponderance of the evidence that plaintiffs had access to all of the material information in this case on or before each of the following two dates which a reasonably prudent investor would have considered material and that therefore defendants had a right to consider that it was not necessary for them to furnish to plaintiffs more information than you find plaintiffs were given access to by the defendants:
Answer
on or before May 13, 1969?
Yes _____ No _√_
on or before June 3, 1969?
Yes _____ No _√_

*QUESTION XXVIII*

Have the plaintiffs established by a preponderance of the evidence that they have suffered any damages in this case?
Answer Yes _√_ No _____

something that one would not have bought or would not have bought at that price, and where, by fraud one is induced to convey property to the fraudulent party. In the former case the damages are to be reckoned solely by "the difference between the real value of the property at the date of its sale to the plaintiffs and the price paid for it, with interest from that date, and, in addition, such outlays as were legitimately attributable to the defendant's conduct, but not damages covering 'the expected fruits of an unrealized speculation.'" [Citations omitted] On the other hand, if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.

496 F.2d *supra* at 1265 n.6, quoting from *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).

In so writing, Judge Ward also noted (at 1264 n.5) that "in pertinent part" the trial court in *Occidental* had given the following instruction to the jury:

The measure of damages is the difference between the price paid by the buyer on the basis of the facts known to him and the price he would have paid had he known of the misrepresentations.

In other words, you must determine how much less than the agreed price, Virginia Surety was worth to the defendant had it known of the omissions and misrepresentations of the plaintiff.[29]

496 F.2d at 1264 n.5. That instruction was seemingly approved in *Occidental* (at 1265) in the Fourth Circuit's opinion therein.

A close reading of the two above quoted footnotes to the *Occidental* opinion reveals that the standards set forth in both of them are identical in wording as to the upper end of the damage formula, *i.e.*, "the price paid" by the recovering party. They appear to differ slightly, however, at the other end of the formula, since the trial court instruction (set forth in n.5) seemingly adopts a subjective test, *i.e.*, " * * * the price he would have paid had he known * * * ", while footnote 6's language indicates a somewhat more objective test, *i.e.*, " * * * the real value of the property at the date of its sale to the plaintiffs * * * ."

Herein, because the Foxes did not pay cash for the K–M stock they acquired, but instead exchanged their Fox Companies' stock for that K–M stock, this Court, as the Court did in *Occidental*, will equate the price paid by the Foxes, *i.e.*, the value of the stock of the Fox Companies, with the value the parties themselves agreed upon in the May 1969 Agreement as that Agreement was modified by the December 1970 Settlement Agreement. That agreed value was what the Foxes got for the Fox Companies, namely, 6977 shares of restricted K–M stock.[30] Therefore, as indicated by *Occidental's* teachings, the damage formula in this case becomes the agreed value of a share of K–M restrict-

---

29. In so commenting, Judge Ward was referring to the damages the defendant as a 10b–5 counterclaimant was entitled to receive.

30. As discussed *supra*, the May 1969 Agreement provided for the Foxes to receive 13,954 shares of K-M outright and to re-

ed stock on May 13, 1969 [31] minus the true value of a share of such stock on that date, times 6977, the total number of shares the Foxes received.

The following Special Questions and answers as to damages were submitted to and originally returned by the jury:

### QUESTION XXVIII

Have the plaintiffs established by a preponderance of the evidence that they have suffered any damages in this case?

Answer Yes ___✓___ No_____

### QUESTION XXIX(A)

What price have plaintiffs established by a preponderance of the evidence that plaintiffs paid for a share of restricted Kane-Miller common stock on:

| | | |
|---|---|---|
| May 13, 1969? | $ | 43.00 |
| June 3, 1969? | $ | 43.00 |

### QUESTION XXIX(B)

What price have plaintiffs established by a preponderance of the evidence that

plaintiffs would have paid on each of the following two dates for a share of restricted Kane-Miller common stock had they known of all of the material facts which a defendant misrepresented or omitted to state?

| | | |
|---|---|---|
| May 13, 1969 | $ | 18.00 – $21.00 |
| June 3, 1969 | $ | 18.00 – $21.00 |

### QUESTION XXX

What value have the plaintiffs established by a preponderance of the evidence a share of restricted Kane-Miller common stock possessed on each of the following two dates:

| | | |
|---|---|---|
| May 13, 1969? | $ | 30.00 |
| June 3, 1969? | $ | 25.00 |

In answering Question XXX you may take into account all facts about the Kane-Miller Corporation known by plaintiffs.

### QUESTION XXXI

What value on each of the following two dates have the plaintiffs established

ceive up to 11,628 more on a contingent basis. However, the effect of the December 1970 Settlement Agreement was to change those portions of the May 1969 Agreement dealing with the consideration received by the Foxes, the employment contracts of the Foxes and the warranty given by K-M in section 6.4 of the May 1969 Agreement while leaving unchanged and in force and effect all of the other provisions of the May 1969 Agreement. *See* paragraph 6 of the December 1970 Settlement Agreement. Those 1970 changes in the 1969 Agreement were supported by consideration, namely, K-M's giving up its right to sue the Foxes for the alleged inventory shortage. The effect of the two Agreements, read together, is that the Foxes sold the Fox Companies for 6977 shares of restricted K-M stock.

31. The date of the signing of the contract, May 13, 1969, rather than the date of the closing, June 3, 1969, would appear to be the determinative date for damages. That earlier date is the date that the legal rights and duties of the parties became fixed. The May 13, 1969 Agreement is mandatory in tone. It provides that the parties "will" and "shall" do various things. There was nothing left to be done on the closing date except for such formalities as the exchange of stock certificates. As of May 13, 1969, the Foxes had become obligated to sell the Fox Companies for a fixed number of shares of K-M stock and the alleged violation of Rule 10b–5 was complete.

There do not appear to be any cases dealing with the choice between the contract and closing dates for purposes of the measurement of damages. However, the discussions as to liability in Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 890–91 (2d Cir. 1972), and SEC v. Texas Gulf Sulphur, 401 F.2d 833, 853 n. 17 (2d Cir. 1968) (en banc), *cert. denied sub nom.* Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), seem to support the view that it is the date upon which legal rights and duties are determined that is controlling and not the date that all settlement details are completed. *See also* Rochez Bros. Inc. v. Rhoades, 353 F.Supp. 795, 802 (W.D.Pa.1973), *vacated and remanded as to damages*, 491 F.2d 402 (3d Cir. 1974), in which the Court wrote, also primarily in the context of liability rather than damages, that "it seems common sense to treat the binding commitment to sell with some degree of finality." There would appear to be no reason why those views expressed in connection with issues of liability are not equally applicable in the context of damages.

by a preponderance of the evidence that a reasonably prudent investor would have placed upon a restricted share of Kane-Miller common stock if he had known all of the material facts which a defendant either misrepresented or omitted to state to plaintiffs:

May 13, 1969? $ 18.00 – $21.00
June 3, 1969? $ 18.00 – $21.00

In answering Question XXXI you may take into account what value plaintiffs, acting in a reasonably prudent manner, would have used and you also may consider whether you find that plaintiffs were reasonably prudent investors, or more or less knowledgeable than reasonably prudent investors.

After the jury originally answered both parts of Questions XXIX(B) and XXXI: "$18.00–$21.00", this Court, with the agreement of counsel, asked the jury to retire once again and to give a single dollar answer to each part of each of those questions. After further deliberation, the jury returned an answer of "$21.00" to the first part of each of those questions and "$18.00" to the second part of each of those questions.

Without considering the effect of the restriction on sale of the K–M stock they received, the Foxes contend, and the jury's answers to Question XXIX(A) seem to find, that the agreed value per share of *restricted* K–M stock was $43.00.[32] Thus, the jury's answers

establish that the "price paid", i. e., the upper end of the damage formula, was $43 per share. Those answers are supported by evidence if no effect be given to the negative value of the restriction; they are not, however, as is discussed *infra*, supported by evidence if any effect is given to the negative value of the restriction. With regard to the lower end of the damage formula, i. e., the "real value" per share of *unrestricted* K–M stock on May 13, 1969, there was opinion evidence given by an expert called by the Foxes that during the May-early June period of 1969, market investors had not yet taken into account what that expert characterized as the deleterious effect upon K–M of the methods adopted by it in financing its acquisitions of Carolina, AMPAC and R.K. Baking, and that therefore the market price of K–M stock was then overvalued. While K–M contends that the market price was at all times an accurate measure of the "real value" of a share of *unrestricted* K–M stock, there was sufficient evidence from which the jury could, and in fact did, determine that the "real value" of K–M stock on May 13, 1969 was $30.[33]

Counsel did not request—and this Court did not ask—the jury specifically to find whether the Foxes knew of the restricted nature of the stock they were acquiring, or, if they so knew, what they believed the "negative value" of that restriction was. From the vantage point

32. There was evidence that during the negotiations leading up to the May 1969 Agreement the Foxes and K–M arrived at an "agreed price" of $1,100,000 for the Fox Companies, with $600,000 to be paid outright and $500,000 to be paid on a contingent basis. The Foxes inquired as to whether those sums would be paid to them in cash or in stock, and K–M seemingly responded that the payment would be in stock. In any event, the parties in the end agreed that payment would be made in "investment stock". There was also evidence that a figure of $43 per share was used to convert the above-mentioned dollar amounts into numbers of shares: the figure of $43 per share was apparently not chosen because of any correspondence with K–M's market price on any given date, but rather was apparent-

ly chosen because that same figure had been used in the recent past by K–M in the acquisition of Bayshore with which the Foxes were familiar. There is, however, no reference in either the May 1969 or the December 1970 Agreement to any per share dollar value of K–M stock; rather in both of those Agreements specific numbers of shares of restricted stock of K–M were referred to.

33. The jury also found that that value on June 3, 1969 was $25. While the record in this case does not appear to contain any indication as to why the jury selected that specific dollar figure, it is to be noted that the market price of K–M stock on the American Stock Exchange on May 13, 1969 was $46¾ and on June 3, 1969 was $42.

of hindsight, this Court presently is of the opinion that it would have been better if such questions had been put to the jury. However, as this Court specifically reminded counsel during the lengthy conferences during which the fifty-two Special Questions were drafted and agreed upon, Fed.R.Civ.P. 49(a) states that if in the use of the special question technique, "the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury." In this case there was no such demand. Rule 49(a) goes on to provide that "[a]s to an issue omitted without such demand the court may make a finding * * * ."

Pursuant to that power, and in the light of the evidence in this case, this Court finds:

1. The Foxes knew that the stock they were acquiring was "for investment", i. e., that it was restricted stock.

2. The Foxes knew that the restriction had a negative value, i. e., that restricted stock was less valuable than unrestricted stock.

3. The negative value of that restriction was 35%.

That last finding is based upon the fact that there was expert testimony given by witnesses called by both the Foxes and K–M which placed the negative value of that restriction within the range of 30% to 40%. It is true that in the answers to the Special Questions, the jury rather clearly completely ignored the effect of that restriction in computing the upper end of the damage formula with regard to the "value paid". See the jury's answer to Question XXIX(A), i. e., that $43 was the value of a share of restricted K–M stock. But there is no evidence in the record in this case which supports the jury's apparent view that the restriction had absolutely no effect upon the "price paid" by the Foxes, or that the Foxes believed the value of the K–M shares they were ob-

taining was totally unaffected by the restriction, or that the Foxes believed the value per restricted share of K–M stock was $43, i. e., the same as the per share value of an unrestricted share of K–M stock. As this Court has found supra in the exercise of its reserved Rule 49(a) fact-finding authority, the Foxes knew of the restriction and understood it had a negative value. In this Court's opinion there is simply no question of the existence of the Foxes' said knowledge and understanding.

■ It is also to be noted that the jury apparently did take into account the negative value of the restriction when it stated in its original and revised answers to Questions XXIX(B) and XXXI that if the Foxes had possessed all material information, they "would have paid", and a reasonably prudent investor also would have paid, $18 or $21 for a share of restricted K–M stock depending upon whether the date of purchase was May 13, 1969 or June 3, 1969. Keeping in mind that the jury seemingly accepted the contentions of the Foxes, and not those of K–M, as to "real value" of unrestricted K–M stock, i. e., the lower end of the damage formula, and that the Foxes' expert witness testified (a) that that value without regard to the restriction was $30 and (b) that the negative value of the restriction was within the 30% to 40% range, simple mathematics indicate that the jury almost surely reduced the $30 figure to $18 and $21 by the application of percentages within that range. Accordingly, this Court, again acting within its reserved Rule 49(a) power, places the negative value of the restriction at 35%.

It flies in the face of common sense, and in addition is not supported in any way by the evidence in this case, to conclude that the restriction should have a negative value as to the lower end of the formula, i. e., "real value", and at the same time have no application or effect upon the upper end of the formula, i. e., the "price paid", and thus in this case the agreed value of a share of restricted

K–M stock. There simply is no reason at all why, if the nature of the *Occidental* test with regard to both ends of the formula is totally objective, the restriction should not be given appropriate negative value, effect and application in determining both ends of the damage formula. *Occidental*, as discussed *supra*, leaves open whether the lower end of that formula is to be determined solely on an objective basis, or on a combined objective-subjective basis. *Occidental* seemingly assumes the upper end of that formula will always be determined on an objective basis. But even if either or both ends of the formula should be determined on a mixed objective-subjective basis, such a determination, in the light of the Foxes' knowledge and understanding of the negative nature of the restriction, leads to the same end result as does the use of a totally objective standard.

The assignment to the restriction of a 35% negative value and the application of 35% to the $43 agreed value of a share of unrestricted K–M stock produce an agreed value of $27.95 for each such share of restricted K–M stock, as of May 13, 1969. That latter figure, *i. e.*, $27.95, is hereby found by this Court, in the context of the exercise of its authority pursuant to Rule 49(a), to be the upper figure in the *Occidental* formula. To the extent that the jury's answers to Special Questions XXIX(A) and XXX are to the contrary, they are entirely without support in the record.[34] The lower figure in that formula is $21, as determined by the jury and as supported by evidence in this case. Accordingly, the Foxes' damages, exclusive of interest, are $6.95 per share times 6977 shares or a total of $48,490.15. Judgment for the Foxes is therefore hereby entered in that amount, plus interest. In so entering judgment, this Court, acting pursuant to Federal Rule 50(b), is, to the extent necessary, granting defendants' pre-verdict motions, and defendants' post-verdict motions for judgment notwithstanding the jury's answers to certain of the Special Questions put to it under Rule 49(a).[35] If this Court did not believe that it possessed power so to do, this Court would exercise its remittitur power, one that " * * * has been uniformly applied by the lower federal courts"[36] since 1822 and has been frequently approved by the Supreme Court[37] and order a new trial on all issues unless the Foxes consent to a reduction of the judgment in their favor to the amount of $48,490.15 plus interest.[38] Indeed, it might even be the

---

34. *See* Dreiling v. General Electric Company, 511 F.2d 768, 775 (5th Cir. 1975), in which the test enunciated in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc) for use in resolving motions for directed verdicts and for judgment notwithstanding the verdict was applied to a motion for judgment n. o. v. in a case involving answers to Rule 49(a) special questions. *Compare* DeJong v. Buzzell, 304 F.2d 230, 234 (7th Cir. 1962) ; R. B. Company v. Aetna Ins. Co., 299 F.2d 753, 758 (5th Cir. 1962).

35. In so doing this Court is guided by what Mr. Justice White wrote in Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963) :

* * * But it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." * * *

We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, * * * before we are free to disregard the jury's special verdict and remand the case for a new trial. [Citations omitted.]

*See also* DeJong v. Buzzell, 304 F.2d 230, *supra* n. 34 ; R. B. Company v. Aetna Ins. Co., 299 F.2d 753, *supra* n. 34.

36. Dimick v. Schiedt, 293 U.S. 474, 483, 55 S.Ct. 296, 299, 79 L.Ed. 603 (1935).

37. *See, e. g.,* Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 65–66, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) ; Neese v. Southern R. Co., 350 U.S. 77, 76 S. Ct. 131, 100 L.Ed. 60 (1955) ; Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, *supra* n. 36.

38. Compare those possible procedures pursuant to Fed.R.Civ.P. 59 with the very similar procedure outlined in Fed.R.Civ.P. 50(c) which requires a Court at the same time

duty of this Court so to act. *See Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 65–66, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). *See generally,* 9 C. Wright & A. Miller, Federal Practice and Procedure, *Civil* § 2815 at 99–106 (1971). In sum, this Court is of the opinion that any judgment in favor of the Foxes which is in excess of $48,490.15, exclusive of interest, would be excessive and would require this Court to order a new trial on all issues, both as to damages and liability, as the trial court did in *Occidental* after an excessive verdict was found in the first trial. But because this Court, in its opinion, has the authority under Rule 50 to enter judgment in that amount, and is exercising that authority, it does not need to proceed herein under its remittitur-new trial authority.

### INTEREST

[32] In discussing whether to award interest in an action brought under section 16(b) of the '34 Act, Mr. Justice Black wrote:

* * * This court has said in a kindred situation that "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." Board of [County] Commissioners of Jackson County, Kansas v. United States, 308 U.S. 343, 352 [60 S.Ct. 285, 289, 84 L.Ed. 313] [1936]. Both courts below denied interest here and we cannot say that the denial was either so unfair or so inequitable as to require us to upset it.

*Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962).

In *Occidental* (at 1268–69), noting (at 1269) that, "* * * while an award of prejudgment interest in a Section 10(b) case is not automatic, it would seem much more likely to occur than in a Section 16(b) case", Judge Ward held that the award of prejudgment interest in a 10b-5 case also lies within the discretion of the trial court[39] and cited *Wolf v. Frank,* 477 F.2d 467, 479 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973), and *Wessel v. Buhler,* 437 F.2d 279, 284 (9th Cir. 1971) in that regard. *See also White v. Abrams,* 495 F.2d 724, 736 (9th Cir. 1974). Accordingly, the award of interest *vel non,* to the Foxes is a determination which calls for the exercise of discretion by this Court.

A look back in this opinion (to pp. 644–645) and the quotations set forth thereat from *Janigan* and *Occidental* discloses that in *Janigan,* (at 786,) it is suggested and in *Occidental,* (at 1269) it was ordered that prejudgment interest on the 10b-5 judgment be awarded from the date the purchase price was paid. However, there is also language in *Occidental,* (at 1269) which seemingly indicates that prejudgment interest was only awarded in that case because it would have been inequitable not to require payment of prejudgment interest on the 10b-5 counterclaim when interest was awarded on the contract claim in the case in chief which had been

---

that it grants a motion for judgment notwithstanding the verdict to make a conditional decision on a new trial motion before it.

In Great Coastal Express, Inc. v. International Brotherhood of Teamsters, etc., 350 F.Supp. 1377, 1380 (E.D.Va.1972), the Court concluded that "owing to the complicated nature of the damage question," a new trial rather than a remittitur was the proper cure for an award of excessive damages. While the damage question herein is complicated, this Court would not feel that it is so

complicated as to require this Court to order a new trial rather than a remittitur, if this Court were not, as it is, entering judgment under Rule 50. *See also* Great Coastal Express, Inc. v. International Brotherhood of Teamsters, etc., 511 F.2d 839 (4th Cir. 1975).

39. Since there was no request by counsel, it was not necessary for this Court to submit the issue of interest to the jury as a special question. *See* Mourikas v. Vardianos, 169 F.2d 53, 57 (4th Cir. 1948).

brought by a party who had violated Rule 10b-5. Nevertheless, a reading of that portion of the *Occidental* opinion in context would appear to indicate that Judge Ward was simply explaining why the Fourth Circuit, in the specific context of *Occidental*, was disturbing and reversing the trial judge's refusal to exercise his discretion to award prejudgment interest on the 10b-5 counterclaim and was in no way intimating that a trial court lacks discretion to award or not to award prejudgment interest in a given case.

The factors and standards which a nisi prius court should use in determining whether or not to grant prejudgment interest in a 10b-5 case are reviewed and analyzed in *Norte & Co. v. Huffines,* 416 F.2d 1189 (2d Cir. 1969), *cert. denied sub nom. Muscat v. Norte & Co.,* 397 U.S. 989, 90 S.Ct. 1121, 25 L. Ed.2d 396 (1970). Those factors include "fundamental considerations of fairness", the degree of personal wrongdoing on the part of the defendants, whether such interest would be truly compensatory, the availability of alternate investment opportunities to the plaintiffs and the possibility that the time between the occurrence of the violation and the award of the judgment may have been intentionally prolonged by the plaintiffs.

In this case, the award of prejudgment interest would appear fair. The jury has found that the Foxes were misled by K–M and, as a result, sold their family business, their primary if not their sole asset, on terms which they would not have accepted but for such actions on K–M's part. Indeed, the jury found that K–M intentionally withheld the omitted material information from the Foxes and was guilty of common law fraud. While it is true that the K–M shares which the Foxes received on June 3, 1969 have paid no significant dividends since that date—a pattern which the Foxes should have expected in view of the specific reference to such a dividend policy at page 4 of the February 5, 1969 Prospectus—it is not clear that if the Foxes had been informed of what the jury has found to be omitted material information, they would not have demanded and obtained more K–M stock. In fact, Frederick Fox testified that he might not have entered into the deal at all if he had known of the omitted information. In opposing the award of prejudgment interest, K–M points to evidence which seemingly reveals that the Fox Companies have lost substantial amounts of money since their acquisition by K–M. However, those Fox Companies apparently made money regularly while being owned by the Foxes, and even though the Foxes continued to manage them for two years after their sale to K–M, it is possible that if the Foxes had still owned the Companies, the Foxes would have been able to keep them profitable and so to increase their value. This case, instituted on June 2, 1971, did not come to trial for over three years. But the delays involved in this complicated case—complicated both in terms of fact and law—cannot be laid on the doorstep of one side as opposed to the other. A further consideration in weighing the issue of prejudgment interest in this case would appear to be the decline in the purchasing value of the dollar since June 3, 1969 as the result of inflation of which this Court believes it can and should appropriately take judicial note. *See* Federal Rule of Evidence 201.[40] In sum, and on balance,

---

40. That Rule provides:
 *Judicial Notice of Adjudicative Facts*
 *(a) Scope of rule.* This rule governs only judicial notice of adjudicative facts.
 *(b) Kinds of facts.* A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
 *(c) When discretionary.* A court may take judicial notice, whether requested or not.
 *(d) When mandatory.* A court shall take judicial notice if requested by a party and supplied with the necessary information.

the scales tip toward the award of pre-judgment interest from and after June 3, 1969 until the date the within judgment is paid and satisfied. Accordingly, such interest is hereby awarded. In reaching that determination, this Court is considering this case in the light of the jury's answers to the Special Questions and the jury's rather obvious acceptance of the credibility and reliability of the testimony of the Foxes and rejection of the testimony given by K–M's officials. Whether this Court as a fact-finder would have made the findings which the jury made should not, in the opinion of this Court, be a determining factor in the exercise by this Court of its discretion with regard to the award of prejudgment interest.

 The legal rate of interest generally applicable in Maryland is 6% per annum. Md.Const.Art. III, § 57. While the rate of interest paid in a federal statutory case is a matter of federal law, state law does, as the Supreme Court has indicated, provide an appropriate and ready-made guide:

> * * * While the New York statute fixing the rate of interest is not controlling, the allowance of interest does not conflict with any state or federal policy and we think that in the circumstances of this case a suitable rate is that prevailing in the state where the obligation was given and to be performed. * * *

*Royal Indemnity Co. v. United States,* 313 U.S. 289, 297, 61 S.Ct. 995, 998, 85 L.Ed. 1361 (1941). Nevertheless, "[t]he comparative states of the money market at the times of purchase"[41] in 1969 and subsequent thereto to date might perhaps be deemed to entitle the Foxes to a higher rate than six per cent, pursuant to the approach discussed in *Johns Hopkins University v. Hutton,* 297 F.Supp. *supra* at 1227–30. However, while this Court might perhaps take judicial notice that the prime interest rate has been higher than six per cent interest per annum during all or part of the period involved, *see* n. 40 *supra,* this Court will not, in the absence of evidence in that regard, pull out of the air a specific interest rate higher than six per cent. Therefore, this Court will utilize Maryland's six per cent legal rate. *Compare White v. Bloomberg,* 360 F. Supp. 58, 63 (D.Md.1973), *aff'd,* 501 F. 2d 1379 (4th Cir. 1974).

 The interest awarded herein will be calculated on a simple, rather than a compound interest, basis. While the compounding of interest is a fact of life with which anyone dealing today with savings banks and similar institutions has experience, nevertheless, in law, it is not usually allowed. Thus, the Restatement of Torts § 913, comment b (1939), states:

> b. *Compound interest.* Compound interest is not allowable as an element of damages in actions at law. In equity it may be granted in the discretion of the court in cases where a fiduciary has used trust funds in its own business and it does not appear what the profits were, or where he had a duty to reinvest and accumulate it for the beneficiary and has failed to do so

---

(e) *Opportunity to be heard.* A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) *Time of taking notice.* Judicial notice may be taken at any stage of the proceeding.

(g) *Instructing jury.* In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

*See* Todd Shipyards Corp. v. The City of Athens, 83 F.Supp. 67, 84 (D.Md.), *aff'd sub nom.* Acker v. The City of Athens, 177 F.2d 961 (4th Cir. 1949) ; Annot., 12 A.L.R.2d 611 (1950).

41. Johns Hopkins University v. Hutton, 297 F.Supp. *supra* at 1229.

(see Restatement of Trusts, § 207 (2)). In any case where there is a duty to pay to the owner the proceeds of something tortiously acquired and disposed of, a wrongdoer who has received compound interest upon such proceeds is liable for the amount, not by way of damages but as restitution (see Restatement of Restitution, § 157).

This identical wording is found in Restatement (Second) of Torts § 913, comment b (Tent. Draft No. 19, March 30, 1973). *See also,* in accord with the Restatement view, *Speed v. Transamerica,* 135 F.Supp. 176, 199 (D.Del.1955), *modified and aff'd,* 235 F.2d 369, 374 (3d Cir. 1956).

For the reasons set forth in this opinion, judgment is hereby entered for plaintiffs in the amount of $48,490.15 with simple interest at the rate of 6% per annum running from June 3, 1969 to the date of payment.